[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Spaulding,* Slip Opinion No. 2016-Ohio-8126.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2016-OHIO-8126

THE STATE OF OHIO, APPELLEE, *v*. SPAULDING, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Spaulding,* Slip Opinion No. 2016-Ohio-8126.]

*Criminal law—Aggravated murder—Convictions and death sentence affirmed.*

(No. 2013-0536—Submitted July 12, 2016—Decided December 15, 2016.)

APPEAL from the Court of Common Pleas of Summit County,

No. CR2012-05-1508.

_____

FRENCH, J.

{¶ 1} This is an appeal of right by defendant-appellant, Dawud Spaulding, who was convicted of the 2011 aggravated murders of Erica Singleton and Ernie Thomas and was sentenced to death. For the reasons below, we affirm Spaulding's convictions and sentence.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Pretrial Background

{¶ 2} In 2012, the state charged Spaulding with two counts of aggravated murder under R.C. 2903.01(A). Each count carried a death specification for course

of conduct, R.C. 2929.04(A)(5), and the first count also carried a death specification for witness murder, R.C. 2929.04(A)(8). The state also charged Spaulding with the attempted murder of Patrick Griffin, felonious assault, domestic violence, menacing by stalking, intimidation of a crime victim or witness, violating a protection order, and having weapons while under a disability. Four counts of the indictment carried firearm specifications.

### B. The State's Case-in-Chief

**{¶ 3}** The state presented evidence of the following at a jury trial, which began in October 2012.

### 1. *Spaulding's relationship with Singleton*

**{¶ 4}** Spaulding and Singleton began dating in 1999 or 2000 and had two children: Dre'San, born in 2004, and Damonie, born in 2009. According to Singleton's mother, by 2006, the couple was fighting "all the time."

**{¶ 5}** In 2008, Singleton allegedly stabbed Spaulding during an argument. While discussing this alleged incident during a 2011 police investigation, Spaulding said that he "deserved it" and that she was retaliating because he had been cheating on her. He also told police that Singleton sprayed him with mace in 2009 and that it angered him because he "wasn't even cheating" at the time.

**{¶ 6}** In April 2010, Singleton called 9-1-1 to report the theft of her car radio. She told the responding officer, Detective Jeremy McGee, that Spaulding had been threatening her via telephone calls and text messages, including one that mentioned that her radio would look good in his car. McGee recorded three voicemail messages that Spaulding had left for Singleton, and the state played them at trial. On the messages, Spaulding referred to Singleton as a "dumb bitch," threatened to get in "[her] grill," said he would "get away with this," and cautioned that he would be "ready" if police came to get him. Spaulding was convicted of domestic violence and telecommunications harassment.

2

**{¶ 7}** In February 2011, Singleton called 9-1-1 to a report a domestic dispute. The responding officer testified that Singleton said her ex-boyfriend had sent her several text messages that morning accusing her of seeing another man. Later, she heard a knock at her door and opened it to find Spaulding. He struck her across the face, knocked her to the floor, and fled with her cell phone. Spaulding pleaded guilty to felony domestic violence.

**{¶ 8}** In August 2011, Singleton requested a civil protection order against Spaulding and testified at an ex parte hearing before Magistrate Tracy Stoner in the Summit County domestic-relations court. Magistrate Stoner testified at trial and recalled Singleton's testimony that Spaulding had threatened her with a gun and threatened her mother and sister. Magistrate Stoner found that this testimony was credible evidence to support Singleton's request and issued a one-year protection order. But the order was dismissed when Singleton did not appear at the final hearing.

**{¶ 9}** In October 2011, Singleton called 9-1-1 from a hotel to report that someone had slashed or let the air out of her car tires. The responding officer testified that Singleton was "terrified" and that she suspected Spaulding. She told the officer that Spaulding had been stalking her by using the GPS in her cell phone. (In December 2011, Spaulding confirmed this suspicion when he told police that he had tracked Singleton to a hotel, where he found her with a man named James.) While the officer was at the scene, Singleton had a phone conversation with a man she identified as Spaulding. The officer heard the man calling Singleton names, swearing, and accusing her of sleeping with "that 'N' word."

**{¶ 10}** After Spaulding learned that Singleton "was messing with James," he began seeing Anitress Morris ("Peaches"). By October or November 2011, Spaulding was staying at Peaches's apartment.

**{¶ 11}** Around the same time, Singleton began a relationship with Ernest Thomas. Singleton often spent time at Thomas's home at 1104 Grant Street in

Akron and, according to Thomas's brother, they were becoming "real close." Spaulding later told police that he had not minded Singleton seeing other men, even though they had "been together for ten years."

{¶ 12} On November 28, 2011, Singleton called 9-1-1 to report that Spaulding had broken into her apartment, held "a gun on [her]," and "almost cut [her] neck." Officers responded and took Singleton's statement. Singleton said that Spaulding had entered the apartment around 5:00 a.m. and stayed several hours, refusing to let her leave. He had straddled Singleton in her bed, held a hand over her mouth, brandished a steak knife and a handgun,[1] and threatened "to kill her as revenge for having him arrested in the past." He had also demanded money. While officers were still at the scene, Spaulding called Singleton. Over speakerphone, Sergeant Carl Woofter heard Spaulding tell Singleton three times to "let this go"; Spaulding also warned, "I'm watching you now."

{¶ 13} Police issued a warrant for Spaulding's arrest on four first-degree felony charges: aggravated robbery, aggravated burglary, domestic violence, and kidnapping. Spaulding later told police that he had been aware that he had been charged and believed (incorrectly) that he was facing an attempted-murder charge. At trial, Lieutenant James Phister explained that Spaulding could have been sentenced to up to 46 years of imprisonment if convicted of these charges.

{¶ 14} Singleton began staying at a battered-women's shelter and again sought a civil protection order against Spaulding. On December 1, 2011, she appeared at an ex parte hearing in Summit County before domestic-relations magistrate Stephan Bennett Collins. At trial, Magistrate Collins testified that Singleton "gave some pretty compelling testimony as to the nature of the violence she had experienced." Magistrate Collins issued a one-year protection order and

---

[1] Spaulding later told police that he had purchased a .25-caliber gun to protect his mother and sister but eventually sold it.

4

scheduled a final hearing for December 14, at which Spaulding would have an opportunity to respond to Singleton's allegations.

{¶ 15} Spaulding told police that he did not speak to Singleton again until about a week after the November 28 incident. He said that he offered Singleton $2,500 to "drop the charges" against him and that she agreed, without accepting the money. On December 6, Singleton contacted police to ask whether she could have the charges dismissed. A few days later, she showed her mother her life-insurance policies and explained, "[J]ust in case something happen[s], * * * I got a hundred thousand dollars on me." On December 14, Singleton did not appear for the final hearing on the civil protection order issued by Magistrate Collins.

{¶ 16} At trial, Singleton's mother testified that she had urged her daughter to leave Spaulding at various times but that Singleton kept "going back" to him. In addition, the state introduced testimony from Dana Zedak, a social worker at a battered-women's shelter. Zedak testified about the dynamics of domestic violence. She explained that victims are often reluctant to prosecute domestic violence and have a tendency to return to abusive relationships and to blame themselves for the violence.

### 2. The events of December 15, 2011

{¶ 17} On December 14, 2011, Singleton asked her mother to watch Dre'San and Damonie. She went to the movies with Thomas, then back to his house at 1104 Grant Street. They spent an hour or two with Thomas's nephew, Patrick "Pee Wee" Griffin, and his friend Anthony Shellman.

{¶ 18} Shortly before 2:00 a.m. on December 15, Griffin left Thomas's home to pick up food and to sell cocaine. Griffin was walking out the side door of the house, which opened onto the driveway, when he saw someone with a gun. The

person shot Griffin in the back of the neck from a distance of three or four feet. The bullet transected his spinal cord and paralyzed him from the neck down.[2]

{¶ 19} Shellman testified that as he was walking out the door, he heard Griffin say, "Ah, shit," followed by three gunshots and Griffin's screams. Shellman ran back into the house and used a mattress for cover. He heard someone unload a gun and exchange the clip. Later, he looked into the kitchen and saw "a tall individual," whom he could not identify. Eventually, Shellman ran out of the house with Thomas and Singleton and called 9-1-1.

{¶ 20} Emergency medical personnel transported Griffin to the hospital. His car remained at 1104 Grant Street, where it blocked Thomas's and Singleton's cars in the driveway until it was towed at 5:00 a.m. According to Thomas's friend, Niechelle Bell, she gave Thomas and Singleton a ride to Singleton's apartment in Tallmadge at 3:30 or 4:00 a.m.

{¶ 21} Around 7:45 a.m., Singleton called her mother, Kimberly ("Kim") Singleton, and said she was on her way to pick up Dre'San for school. Not long after, Spaulding called Kim and asked, "Did Erica make it there yet?" Kim told him that Singleton was on her way. In response, Spaulding "started laughing" and asked, "She ain't made it there yet?"

{¶ 22} At 8:01 a.m., two men found Singleton and Thomas lying in the driveway of 1104 Grant Street and called 9-1-1.

---

[2] As a result of his injuries, Griffin is a quadriplegic, has undergone multiple surgeries, and requires constant care. Thus, he did not testify at trial. Instead, over defense objection, the state played a video recording of Griffin's deposition from September 18, 2012. The judge was present at the deposition, and Griffin was cross-examined by defense counsel. Spaulding and lead defense counsel, Donald Walker, were not in the same room as Griffin but participated in the deposition from a nearby room via a live, closed-circuit video feed.

### 3. Initial investigation

{¶ 23} Police were dispatched to 1104 Grant Street twice on December 15, 2011, arriving first at 1:55 a.m. to investigate Griffin's shooting and then at 8:05 a.m. to investigate Singleton's and Thomas's deaths.

{¶ 24} After Griffin's shooting, police secured the crime scene, searched the house, and collected evidence. They noted bullet holes in the kitchen doorframe and recovered .32-caliber shell casings from the front porch, the dining-room table and floor, and the dining-room doorframe. Police also found evidence of drug trafficking in the house, including a scale and a baggie of powder cocaine. And Griffin's car contained what appeared to be drugs and $2,400 in cash.

{¶ 25} Officers finished processing the scene around 5:00 a.m. Three hours later, after Singleton's and Thomas's bodies were found, an officer took a six-minute video of the crime scene, including the inside and outside of 1104 Grant Street and the victims.

{¶ 26} The video showed Singleton and Thomas lying on the driveway next to their cars. Singleton was face-down, holding a piece of luggage and a purse. Thomas was face-up several feet from Singleton. The driver-side door of his car was open, keys were in the ignition, and the car was running. A bag of clothes and a piece of luggage were in the backseat, and another piece of luggage was next to the car.

{¶ 27} Summit County's Chief Medical Examiner, Dr. Lisa Kohler, and Deputy Medical Examiner, Dr. Dorothy Dean, conducted autopsies and concluded that Singleton and Thomas each died from a single gunshot wound to the back of the head. The medical examiners classified the deaths as homicides.

{¶ 28} Police did not recover the weapon used to shoot Griffin, Singleton or Thomas. But they did collect four 9-mm shell casings from the driveway of 1104 Grant Street. Lieutenant Phister testified that two of the four casings were present when police photographed the scene after Griffin's shooting and that two more

were present when police returned to the scene just after 8:00 a.m. Subsequent analysis by the Bureau of Criminal Investigation revealed that all four casings were fired from the same weapon, a 9-mm Luger.

{¶ 29} Singleton's mother went to 1104 Grant Street and told police that she suspected Spaulding. When Detective Richard Morrison learned that Spaulding had outstanding felony warrants related to his alleged robbery and kidnapping of Singleton, he directed officers to bring Spaulding in for questioning.

{¶ 30} Meanwhile, police continued to pursue other leads. But, according to Detective Morrison, "in the end * * * everything started coming back to [Spaulding]."

### 4. Spaulding's arrest and interrogation

{¶ 31} On December 16, police arrested Spaulding at Peaches's apartment around 7:00 or 8:00 p.m. Detectives questioned Spaulding that night and two more times on December 19. The state played redacted video recordings of the first and third interrogations at trial.

{¶ 32} During the interviews, Spaulding consistently denied the charges related to the November 28 incident and responsibility for all three shootings. He said he was at Peaches's apartment all night on December 14 to 15 and that he left at around 7:30 a.m. on December 15 to buy marijuana on Channelwood Circle in Akron. According to Spaulding, as he was driving to Channelwood Circle, he texted Singleton shortly before 8:00 a.m. and asked whether he could speak to their son, Dre'San, before Dre'San went to school. Singleton agreed to call after she picked up Dre'San. When Spaulding did not hear from Singleton, he called her mother, Kim, at around 8:15 a.m. to see whether Singleton had arrived. Kim said no. After that, Spaulding bought the marijuana, spent at least an hour at the house of his cousin Amhad, and then returned to Peaches's apartment.

{¶ 33} Spaulding offered police two possible leads on the December 15 shootings. First, he urged officers to speak to two women named Ciera and Keona,

8

who reportedly saw Singleton after Griffin was shot. According to Spaulding, Singleton went to Ciera's house early on December 15, "laughing" about someone getting shot. Ciera told Spaulding that Singleton hid "some dope and a gun" at the house and retrieved them later. Ciera also said that Singleton mentioned four men who were wearing masks. But neither Ciera nor Keona was willing to speak to police. As a second possible lead, Spaulding told officers about rumors that the shootings involved an attempted robbery or a drug deal gone bad. He had heard that Griffin had shorted a buyer a few grams of marijuana, then started "flashing money around."

{¶ 34} During police questioning, Spaulding denied knowing that Singleton was staying at 1104 Grant Street. But he admitted that by 4:00 a.m. on December 15, he knew that Singleton was not at a shelter. He was familiar with Thomas's house, Singleton's license plate number, and her car. But Spaulding insisted that he had never been to 1104 Grant Street, that he did not know Thomas, and that he had not been jealous. Spaulding suggested that if she had been home with the kids or had taken the kids to school, then she would not have been at the "wrong place at the wrong time."

{¶ 35} Police could not verify Spaulding's alibi. According to police, Peaches—who did not testify at trial—said that Spaulding was living with her, but she did not confirm that he was home all night on December 14 to 15. Instead, she told police that she had called Spaulding looking for him around 7:50 a.m. on December 15. Peaches was talking to Spaulding on the phone when he received a call informing him of Singleton's death.

{¶ 36} When police told Spaulding that Peaches did not back up his alibi, Spaulding changed his story; he said that December 14 to 15 must have been the night he slept in the driveway of his cousin's house, on the west side of town.

{¶ 37} Cell-phone records also contradicted Spaulding's accounts. He had sent text messages to Singleton during the night of the shootings expressing concern

that she was with another man. Around 10:00 p.m., he texted her, "Dam u wit a nigga y u aint answer." Nine minutes later, he texted her, "Dam we just broke up u wit a nigga already." On December 15, his phone was used to place six calls— three between 2:04 and 2:15 a.m. and three between 7:58 and 8:08 a.m.—that bounced off cell-phone towers in the vicinity of 1104 Grant Street. And although Spaulding had denied knowing Thomas, his phone had been used to place five calls to Thomas's phone on December 14 and 15.

### 5. *Witness identifications and inculpatory statements*

{¶ 38} Two witnesses identified Spaulding, and two other witnesses testified that they had heard him make inculpatory statements.

{¶ 39} First, Patrick Griffin identified Spaulding as his shooter. Police interviewed Griffin in the hospital on December 20, 2011. Detective Morrison asked Griffin several questions, including whether the shooter was Singleton's ex-boyfriend. Griffin, who was unable to speak, nodded his head "yes." Police then showed Griffin six photos, including a photo of Spaulding, and asked whether any of the men was the shooter. Griffin shook his head "no" to each. Griffin viewed the same array again a few minutes later, after police told him about the murders of Singleton and Thomas. During the second viewing, Griffin identified Spaulding's photo and indicated he was "a hundred percent sure" that that man had shot him.

{¶ 40} Griffin twice more verified his identification of Spaulding. In May 2012, police asked him to view the photo array again so they could record the identification. (Recording had not been possible on December 20, because Griffin was in the intensive-care unit.) And during a deposition in September 2012, Griffin identified Spaulding as his shooter via closed-circuit video.

{¶ 41} Second, Todd Wilbur testified that he saw a man—whom he identified as Spaulding at trial—outside 1104 Grant Street the morning of December 15. Wilbur stopped his car at the corner of Grant Street and Stanton Avenue for 15 to 20 seconds around 7:52 a.m. He saw two people coming down

from the porch of 1104 Grant Street—a black man and a black woman carrying a piece of luggage. While Wilbur watched, a second black man walked down the sidewalk toward the house. When she noticed the second man, the woman stopped in her tracks. The two men met at the end of the driveway. Wilbur observed "heated" body language, then saw the second man push the first and motion to his own waistband. Wilbur did not want his son (a passenger in the car) to see a fight, so he drove away. After driving about 50 feet, Wilbur "hear[d] pop and then pop."

{¶ 42} Later that morning, Wilbur returned to the scene. He told police that he had seen an altercation and a car in the driveway. But he was reluctant to offer more details because it was a rough neighborhood and he was scared. Around nine months later, after moving to a new neighborhood, Wilbur approached police to elaborate on his statement.

{¶ 43} Third, Anthony Shellman testified that he confronted Spaulding while they were both incarcerated in the Summit County Jail. Shellman accused Spaulding of "kill[ing] [Shellman's] dude" and said that he had been at 1104 Grant Street the night of the shootings. Spaulding responded, "No, you wasn't."

{¶ 44} Finally, James Allen Gilbert testified that he had met Spaulding in the Summit County Jail. According to Gilbert, Spaulding said that Spaulding's cousin had burned the clothes Spaulding "had on that day" and that "[t]he pistol in [his] case no longer exists."

### C. The Defense Case

{¶ 45} Spaulding's counsel tried to create reasonable doubt by suggesting alternative theories of the murders, supported by testimony elicited on cross-examination.

{¶ 46} First, the defense attempted to cast doubt on Griffin's identification of Spaulding. On cross-examination, Detective Morrison conceded that someone could have told Griffin information about the identity of the shooter before he first viewed the photo array. Four of Griffin's family members visited him in the

hospital, and only two testified that they did not tell him that police suspected Spaulding. (The other two did not testify on the issue.) The defense also implied that Morrison may have been unduly suggestive when, just before Griffin was shown the photo array, he asked Griffin whether the shooter had been Singleton's ex-boyfriend.

{¶ 47} In addition, there was conflicting testimony about whether there was enough light for Griffin to see his assailant at the time of the shooting. Griffin testified that a light was on above the side door of 1104 Grant Street, but Shellman testified that the area near the side door was dark. Two officers who responded to the Griffin shooting testified that they could see three or four feet away in that area, but one officer said that he used his flashlight and the other observed that some light was generated by police cruisers at the scene.

{¶ 48} Second, the defense suggested that the murders may have been drug related. Evidence indicated that Griffin and Thomas were known drug dealers and that drugs had been sold at 1104 Grant Street for years. Griffin claimed that when he was leaving 1104 Grant Street just before his shooting, he was going to sell cocaine to a customer named Glen Brown. But Carl Thomas (Thomas's brother) testified that Griffin was meeting Brown at the house.

{¶ 49} Finally, the defense implied that the shootings were related to the murder of David Clark ("Frog"). Frog, a childhood friend of the Thomas brothers, was murdered around the corner from 1104 Grant Street in June 2011. The defense implied that Thomas, who police initially believed was present when Frog was murdered, may have been killed by someone getting revenge on Frog's behalf. But the officer who investigated Frog's murder testified that Thomas was not present when Frog died, and Detective Morrison testified that police never found any connection between the murders. Carl Thomas also testified that his brother had long been cleared of suspicion; he denied any lingering friction between the Clark and Thomas families after Frog's death.

## D. Verdict and Sentencing

{¶ 50} The jury convicted Spaulding of all counts and specifications, with two exceptions: Count 7, menacing by stalking, and the first capital specification to Count 1, alleging that Spaulding purposely killed Singleton to prevent her from testifying as a witness in another case.

{¶ 51} After a mitigation hearing, the trial court accepted the jury's recommendation to sentence Spaulding to death. The court also sentenced Spaulding to 32 and a half years on the remaining counts.

## II. ANALYSIS

{¶ 52} On direct appeal, Spaulding raises 14 propositions of law. For clarity, we address these propositions out of order.

## A. Absence of Defense Counsel

{¶ 53} Before Spaulding's arraignment, two capital-certified counsel were appointed to represent him. But, according to Spaulding, there were a number of occasions when either lead counsel, Donald Walker, or co-counsel, Jason Wells, was absent for a hearing or part of the trial. In proposition of law No. 1, Spaulding contends that these absences violated his Sixth Amendment and due-process rights.

{¶ 54} Spaulding's argument begins with his interpretation of former Sup.R. 20,[3] which governed the appointment of counsel for indigent defendants charged with capital offenses at the time of his trial. Pursuant to former Sup.R. 20(I)(C), if a "defendant is entitled to the appointment of counsel, the court shall appoint two attorneys certified pursuant to Sup.R. 20 through 20.05."

{¶ 55} According to Spaulding, because former Sup.R. 20 entitled him to two appointed counsel, he was also entitled to have two counsel present at every stage of the litigation. But Sup.R. 20 "does not require that both appointed

---

[3] We quote the version of Sup.R. 20 that was in effect in 2011 and 2012, the period at issue in this case. The cited rules are now found in Appt.Coun.R. 5.02, which became effective February 1, 2015. *See* 141 Ohio St.3d CLXXXIII-CLXXXIV.

attorneys be involved in every aspect of a defendant's case." *State v. Parker*, 516 S.E.2d 106, 114 (N.C.1999) (interpreting an analogous North Carolina law that entitles an indigent capital defendant to two attorneys). In fact, capital defendants are generally represented by a team, which may include multiple attorneys, an investigator, a mitigation expert, and medical experts. Appt.Coun.R. 5.10(A). Lead counsel "bear[s] overall responsibility for the performance of the defense team," but it is expected that he or she will "allocate, direct, and supervise the work of the defense team." Appt.Coun.R. 5.10(B); *see also* American Bar Association, *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, Guideline 10.4(B) (Rev.Ed.2003), reprinted in 31 Hofstra L.Rev. 913, 999 (2003). The rules do not require both appointed counsel to be present at every pretrial hearing or every moment of trial.

{¶ 56} We also reject Spaulding's related claim that his trial counsel were constitutionally ineffective because both were not present at every proceeding. To establish a Sixth Amendment violation, a defendant ordinarily must establish both that counsel performed deficiently and that he or she was prejudiced by the deficient performance. *Strickland v. Washington*, 466 U.S. 668, 686, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). However, the United States Supreme Court "has uniformly found constitutional error *without* any showing of prejudice when counsel was * * * totally absent, or prevented from assisting the accused during a critical stage of the proceeding." (Emphasis added.) *United States v. Cronic*, 466 U.S. 648, 659, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), fn. 25; *see also Strickland* at 692 ("Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice").

{¶ 57} Here, Spaulding does not assert—nor does the record indicate—that both his counsel were ever "totally absent." As such, we decline to presume prejudice under *Strickland*. *See People v. Montiel*, 5 Cal.4th 877, 906, 21 Cal.Rptr.2d 705, 855 P.2d 1277 (1993), fn. 5 ("there is no authority for the

proposition that a capital defendant has the right to the courtroom presence of both appointed cocounsel"); *see also Jones v. State*, 124 Nev. 1483, 238 P.3d 827, *6 (2008) (unpublished) (capital defendant not totally deprived of counsel where "he was represented by counsel at all critical stages of the criminal proceedings, albeit in one or two instances by only one counsel").

{¶ 58} Therefore, to establish a Sixth Amendment violation, Spaulding would have to prove that "but for" his attorneys' isolated absences, "the result of the proceeding would have been different." *Strickland* at 694. But Spaulding does not explain how he was prejudiced by Walker's or Wells's absence at any proceeding, or even the cumulative effect of those absences. And the record shows that Walker actively represented Spaulding in Wells's absence and that Wells actively represented Spaulding when Walker was absent. Under these circumstances, counsel's absences did not violate Spaulding's rights to counsel or due process.

{¶ 59} We therefore reject proposition of law No. 1.

### B. Joinder

{¶ 60} In proposition of law No. 5, Spaulding argues that the trial court violated his rights to due process and a fair trial when it denied his motion for relief from prejudicial joinder. We disagree.

### 1. Crim.R. 8(A) and 14

{¶ 61} Ohio "favors joining multiple offenses in a single trial * * * if the offenses charged 'are of the same or similar character.' " *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990), quoting Crim.R. 8(A). Crim.R. 8(A) also allows the joinder of offenses that "are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." Permitting joinder "conserves resources by avoiding duplication inherent in multiple trials and minimizes the possibility of incongruous results that can occur

in successive trials before different juries." *State v. Hamblin*, 37 Ohio St.3d 153, 158, 524 N.E.2d 476 (1988).

**{¶ 62}** "Notwithstanding the policy in favor of joinder," Crim.R. 14 permits a defendant to request severance of the "counts of an indictment on the grounds that he or she is prejudiced by the joinder of multiple offenses." *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 49. In doing so, the defendant "has the burden of furnishing the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial." *State v. Torres*, 66 Ohio St.2d 340, 343, 421 N.E.2d 1288 (1981). Even then, the state can overcome a defendant's claim of prejudicial joinder by showing either that (1) it could have introduced evidence of the joined offenses as "other acts" under Evid.R. 404(B) or (2) the "evidence of each crime joined at trial is simple and direct." *Lott* at 163.

**{¶ 63}** We review a trial court's ruling on a Crim.R. 14 motion for an abuse of discretion. *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 166. A defendant who appeals the denial of relief bears a heavy burden:

> He must affirmatively demonstrate (1) that his rights were prejudiced, (2) that at the time of the motion to sever he provided the trial court with sufficient information so that it could weigh the considerations favoring joinder against the defendant's right to a fair trial, and (3) that given the information provided to the court, it abused its discretion in refusing to separate the charges for trial.

*State v. Schaim*, 65 Ohio St.3d 51, 59, 600 N.E.2d 661 (1992).

**{¶ 64}** If a defendant did not file a Crim.R. 14 motion in the trial court, however, we review claims of prejudicial joinder for plain error. *See Lott*, 51 Ohio

St.3d at 164, 555 N.E.2d 293. To prevail under this standard, the defendant must establish that an error occurred, it was obvious, and it affected his or her substantial rights. *See* Crim.R. 52(B); *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002) (an error affects substantial rights only if it "affected the outcome of the trial"). We take "[n]otice of plain error * * * with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

### 2. *Spaulding's motion for relief*

{¶ 65} To determine whether the trial court erred by denying Spaulding's Crim.R. 14 motion, it is first necessary to clarify the relief he sought at trial.

{¶ 66} Spaulding's written motion did not specify which counts of the indictment he wanted the trial court to sever, but defense counsel later clarified the request. During a pretrial hearing, counsel expressed concern that the jurors would be prejudiced against Spaulding after hearing all the charges against him; he reasoned that the jurors would assume Spaulding's guilt as soon as they learned that he was accused of shooting three victims. Defense counsel explained that the menacing-by-stalking charge would permit the state to introduce evidence of Spaulding's relationship with Singleton during the 17 days prior to the murders "or even years before that." And he argued that this evidence was irrelevant to the attempted murder of Griffin because the attempted murder arose from a "different fact pattern[ ]" than the murders of Thomas and Singleton.

{¶ 67} The trial court appeared receptive to Spaulding's concerns about the prejudicial impact of evidence that the state might introduce to prove menacing by stalking. After hearing defense counsel's arguments, the court said, "I think the only place you get with your argument is your argument about menacing by stalking bringing in a lot of prior conduct. But I can't see separating the two murders from

17

the attempted murder." Counsel responded, "That's what we're looking to do, Your Honor, and we'd like our objection noted."

{¶ 68} In light of this exchange, it became clear that defense counsel wanted the court to order separate trials for the crimes relating to Griffin, on the one hand, and the crimes relating to Singleton and Thomas, on the other hand. But defense counsel did not specifically ask the court to sever the menacing-by-stalking count or any other count of the indictment, even when the trial court pressed the issue.

{¶ 69} Under these circumstances, the trial court reasonably denied Spaulding's request. Counts 1 through 3 of the indictment—aggravated murder of Singleton, aggravated murder of Thomas, and attempted murder of Griffin— alleged offenses that were part of a single course of criminal conduct that occurred on the morning of December 15, 2011. These crimes all occurred at the same location and involved the same weapon. And even though they involved three different victims, the evidence of these crimes was interrelated. *See Hamblin*, 37 Ohio St.3d at 158, 524 N.E.2d 476 (joinder proper when two criminal acts had occurred near each other, less than 20 minutes apart, in part because evidence of the crimes "was interrelated").

### 3. *Menacing by stalking and domestic violence*

{¶ 70} On appeal, Spaulding also claims that the trial court erred "[b]y denying the motion to sever the domestic violence and menacing by stalking charges from the aggravated murder and attempted murder charges." But, as explained above, Spaulding did not ask the trial court to sever those counts. As such, we review this claim for plain error only. *Lott*, 51 Ohio St.3d at 164, 555 N.E.2d 293.

{¶ 71} Count 6 of the indictment alleged that Spaulding committed domestic violence against Singleton on December 15, 2011. And because the state charged Spaulding with third-degree-felony domestic violence, it had to prove not only that he committed domestic violence on December 15, but also that he had

18

two or more prior domestic-violence convictions.  R.C. 2919.25(D)(4).  As such, the inclusion of Count 6 in the indictment meant that jurors would learn about Spaulding's prior acts of domestic violence.

**{¶ 72}** Count 7 charged Spaulding with committing menacing by stalking against Singleton between November 29 and December 15, 2011.  To convict Spaulding on this count, the state had to prove that he had "engag[ed] in a pattern of conduct" that "knowingly cause[d]" Singleton to believe that he would cause her physical harm or mental distress.  R.C. 2903.211(A)(1).  Accordingly, as explained below in the analysis of proposition of law Nos. 6 and 7, evidence of Spaulding's past domestic violence would be relevant to establish both a pattern of conduct and that Spaulding knew that his conduct would cause Singleton to believe that he was going to harm her.  *See State v. Horsley*, 10th Dist. Franklin No. 05AP-350, 2006-Ohio-1208, ¶ 25-26; *State v. Bilder*, 99 Ohio App.3d 653, 658, 651 N.E.2d 502 (9th Dist.1994).

**{¶ 73}** Thus, the joinder of Counts 6 and 7 with the other counts of the indictment undeniably stood to expose the jury to significant evidence that might prejudice Spaulding's trial on the remaining charges.  And, at trial, the state did introduce extensive evidence of Spaulding's prior bad acts to support these charges.  Under these circumstances, if Spaulding had requested severance of these two counts and provided the trial court adequate information about the prejudicial effect that joinder would have on his trial, the court would have been justified in severing these counts for trial.

**{¶ 74}** That said, the trial court did not plainly err by permitting these counts to be tried together.  The joinder of these counts was not erroneous on its face at the outset of trial.  And even if it had been, given the substantial evidence of Spaulding's guilt, the alleged error was not outcome determinative.  *See Barnes*, 94 Ohio St.3d at 27, 759 N.E.2d 1240.  Witnesses placed Spaulding at 1104 Grant Street at the time of both shootings.  Griffin identified Spaulding as his shooter, and

Wilbur saw Spaulding with Singleton and Thomas moments before their murders. And ballistics evidence indicated that the same weapon was used in both incidents. Under the circumstances, we find no plain error.

{¶ 75} For these reasons, we reject proposition of law No. 5.

## C. Motions to Suppress

{¶ 76} Proposition of law Nos. 2 and 4 assert that trial counsel provided constitutionally ineffective assistance with regard to two suppression issues. We disagree.

{¶ 77} To prevail, Spaulding must (1) show that counsel's performance "fell below an objective standard of reasonableness," as determined by "prevailing professional norms," and (2) demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674. When performing a *Strickland* analysis, we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

### 1. Griffin's identification

{¶ 78} In proposition of law No. 2, Spaulding argues that his trial counsel's efforts to challenge Griffin's identification were constitutionally ineffective.

### a. Factual background

{¶ 79} On October 18, 2012, after three days of voir dire, defense counsel filed a motion to suppress all evidence and statements obtained as a result of Griffin's identification of Spaulding in a photo array. Spaulding argued that the "identification process * * * was unduly suggestive and tainted the identification." He raised two specific objections: (1) the Akron Police Department had not adopted procedures for conducting photo arrays, as required by R.C. 2933.83, and (2) the photos in the array were themselves "unnecessarily suggestive and conducive to irreparable mistaken identification."

{¶ 80} On October 19, 2012, the trial court questioned defense counsel about the lateness of their motion. Counsel explained that although they initially had reservations about it, they ultimately decided that the motion was proper in order to protect the record and themselves on appellate review.

{¶ 81} The court then heard testimony from Detective Morrison about his interview of Griffin on December 20, 2011. Morrison explained that at the time, Griffin was in the hospital's intensive-care unit, was intubated, and could communicate only by nodding his head "yes" or shaking his head "no."

{¶ 82} Detective Morrison asked Griffin several preliminary questions before beginning the array, to make sure "he was with it." When he concluded that Griffin understood the preliminary questions and was responding appropriately, Morrison proceeded with the array.

{¶ 83} Griffin viewed the array twice on December 20. On the first viewing, he shook his head "no" to all six pictures. But Detective Morrison testified that Griffin "stared, kind of had a little angry look" when he reached the fourth photo (later identified as Spaulding). After Griffin failed to make an identification, Morrison told him that two of his friends had been killed. Then Griffin viewed the array a second time. According to Morrison, when Griffin reached the fourth photo, his eyes entered a "dead stare" and "tears started rolling down his eyes." He identified the person as his shooter, nodding "yes" when Morrison asked whether he was "100 percent sure."

{¶ 84} Police did not record the December 20 interview and photo array because Griffin was in intensive care. But almost six months later, on May 11, 2012, Griffin viewed the array a third time and again identified Spaulding. Police recorded that identification on video.

{¶ 85} In addition to Detective Morrison's testimony, the state introduced a written copy of the Akron Police Department's photo-array procedures, the photo-

array instructions that were read to Griffin, the array he viewed, and the recording of the May 2012 identification.

{¶ 86} After reviewing the evidence, the trial court overruled the suppression motion. In a written order, the court rejected Spaulding's claim that the police department had not adopted a proper photo-array procedure and also found, "upon its own inspection of the photo array used in this case, that the photo array is not impermissibly suggestive." The court also noted that Spaulding's motion was untimely.

### b. Analysis

{¶ 87} Spaulding argues that his trial counsel provided constitutionally ineffective assistance with regard to Griffin's identification in three ways.

{¶ 88} First, he argues that his counsel were unprepared to challenge Griffin's identification, as evidenced by their filing the suppression motion several days after voir dire had begun. The trial court noted the untimeliness, and the prosecutor cited this as grounds for rejecting the motion. *See* Crim.R. 12(C)(3) (requiring that any suppression motions be filed before trial). But even so, Spaulding was not prejudiced by counsel's dilatory filing: the trial court held a suppression hearing and resolved the motion on its merits.

{¶ 89} Second, Spaulding maintains that counsel's suppression motion was so inadequate that it violated his Sixth Amendment rights. Initially, he points to the late filing as proof that counsel were unprepared to argue the suppression issue. Then he argues that counsel failed to mention three facts that would have supported suppression: (1) Griffin did not identify Spaulding in the first array, (2) Griffin was in poor health on December 20, and (3) several days passed between the shooting and the first array. But even if counsel should have stressed all these points, Spaulding cannot establish prejudice. Detective Morrison testified to all of this information during the suppression hearing. Thus, the trial court was apprised of these facts before it ruled on the motion.

22

**{¶ 90}** Finally, presumably in an effort to show how his trial counsel compounded the harm done by ineffectively arguing his suppression motion, Spaulding critiques counsel's performance during Detective Morrison's testimony at trial. According to Spaulding, trial counsel should have cross-examined Morrison about Griffin's initial failure to make an identification. But "[t]he scope of cross-examination falls within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel." *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 101.

**{¶ 91}** Spaulding also argues that trial counsel should have objected when Detective Morrison vouched for Griffin's second identification as follows:

> Q: Now, in your experience as a detective, do you feel
> that he was honest in the statement that he gave?
> A: The second one, yes.

Spaulding is correct in this regard; counsel should have objected to this testimony. *See State v. Young*, 8th Dist. Cuyahoga No. 79243, 2002-Ohio-2744, ¶ 75-77 (officer's testimony that a witness was "telling the truth" "improperly invaded the province of the jury because only it can determine witness credibility"). But, even so, Spaulding cannot establish that "but for" Morrison's vouching, the result of his trial would have differed. *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052, 80 L.Ed.2d 674. Even without Griffin's identification, the jury heard Wilbur's testimony that Spaulding was at 1104 Grant Street with Singleton and Thomas moments before their murders, and ballistics evidence linked those murders with the shooting of Griffin several hours earlier. Furthermore, the jury knew that Griffin initially identified Spaulding only minutes after his first viewing of the photo array and also had the opportunity to view video recordings of Griffin identifying Spaulding in May 2012 and September 2012.

**{¶ 92}** We reject Spaulding's second proposition of law.

### *2. Spaulding's statements*

**{¶ 93}** Police questioned Spaulding three times after his arrest, once on December 16, 2011, and twice on December 19, 2011. During the third interrogation, Spaulding made statements about his movements on December 14 and 15, his actions during the previous week, and his criminal history. In proposition of law No. 4, Spaulding claims that trial counsel should have moved to suppress the third interrogation.[4]

**{¶ 94}** The "failure to file a suppression motion does not constitute *per se* ineffective assistance of counsel." *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). Instead, the ordinary two-part *Strickland* analysis for ineffective assistance claims applies. *Id.* Thus, Spaulding must both "prove that there was a basis to suppress the evidence in question," *State v. Brown*, 115 Ohio St.3d 55, 2007-Ohio-4837, 873 N.E.2d 858, ¶ 65, and demonstrate a reasonable probability that had the evidence been suppressed, "the result of the proceeding would have been different," *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052, 80 L.Ed.2d 674.

**{¶ 95}** Spaulding asserts two bases for suppressing the statements he made during the third interrogation: (1) he unequivocally invoked his right to counsel and (2) the conditions of the interrogation were unduly coercive. He then argues that he was prejudiced by the admission of these statements because they exposed the jurors to "184 pages of discussion about Spaulding's criminal history and close ties to Akron's criminal community." For example, Spaulding referred to his prior domestic-violence convictions, his drug use, and the recent shooting of his cousin.

---

[4] Spaulding specifically argues that his counsel were ineffective for failing to request suppression of Exhibit 230, a transcript of the third interrogation. But the trial court did not admit Exhibit 230. For purposes of analyzing this proposition, we consider Exhibit 214A, a redacted video recording of the third interrogation, which *was* submitted to the jury.

{¶ 96} Here, we cannot find ineffective assistance because, even assuming that the third interrogation should have been suppressed, Spaulding cannot satisfy *Strickland*'s second prong. Spaulding's assertion of prejudice turns solely on his concerns about statements that revealed aspects of his criminal history. But the jury learned about Spaulding's criminal history from numerous sources, including his other statements to police. And Spaulding has failed to identify specific noncumulative information about his criminal history, let alone show a "reasonable probability" that excluding this information would have led to his acquittal on any of the charged offenses. *See State v. Madrigal*, 87 Ohio St.3d 378, 389-390, 721 N.E.2d 52 (2000). As described above, eyewitness identifications and ballistics evidence provided ample basis for the jury to convict Spaulding of murder and attempted murder.

{¶ 97} For these reasons, proposition of law No. 4 fails.

### D. Trial Phase

#### 1. *Jury view*

{¶ 98} With the agreement of both parties, the trial court permitted the jury to view 1104 Grant Street. In proposition of law No. 3, Spaulding takes issue with how the jury view was conducted, arguing that his due-process rights were violated and that he received ineffective assistance of counsel.

{¶ 99} First, Spaulding objects to the absence of any record of the jury view. Before the jury view, the prosecutor explained to the court that she and defense counsel had agreed that neither of them would address the jury while they were at the scene. Instead, the bailiff would read written instructions prepared by the state and approved by the defense. Given this arrangement, Spaulding's trial counsel waived the court reporter's presence at the jury view. The record includes a copy of the prepared instructions, but there is otherwise no documentation of what happened during the jury view.

{¶ 100} Spaulding argues that due process entitles him to a complete record, including a record of the jury view. But "[w]e will not reverse because of unrecorded proceedings when the defendant failed to object and fails to demonstrate material prejudice." *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 135. Here, Spaulding's counsel not only failed to object, they expressly *waived* the reporter's presence, thus inviting any error. *See Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co.*, 28 Ohio St.3d 20, 502 N.E.2d 590 (1986), paragraph one of the syllabus ("A party will not be permitted to take advantage of an error which he himself invited or induced"); *State v. Campbell*, 90 Ohio St.3d 320, 324, 738 N.E.2d 1178 (2000) (invited error may be found "when a party has * * * affirmatively consented to a [proposed] procedure").

{¶ 101} Moreover, any assertion of prejudice here is purely speculative. Spaulding concedes that it is impossible to know whether "anything improper occur[red]" without a record. And he did not take advantage of S.Ct.Prac.R. 11.03(D), which allows appellants to supplement the record with a statement of proceedings "when no report was made or when the transcript is unavailable." Instead, the record that is available undermines Spaulding's concerns. Shortly after the jury view, the trial judge asked defense counsel whether "any problems * * * developed on the jury view," and he said "no."

{¶ 102} Spaulding also claims that his counsel were constitutionally ineffective for waiving the reporter's presence at the jury view. But even assuming deficient performance, Spaulding would need to rely on evidence *outside* the record to establish prejudice under *Strickland*. As such, this argument is "not appropriately considered on a direct appeal." *Madrigal*, 87 Ohio St.3d at 391, 721 N.E.2d 52 (because proof outside the record was needed to establish ineffective assistance of counsel, the claim was not appropriate on direct appeal).

{¶ 103} As a second basis for relief on this claim, Spaulding asserts that "[t]he record * * * suggests that [he] was not present during the jury view." Under

Ohio law, defendants have a waivable right to attend a jury view, R.C. 2945.16, but we have not recognized any concomitant constitutional guarantee. *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 96. Here, it is unclear whether Spaulding attended the jury view. But, if anything, the record suggests that he did; at a hearing the day before the jury view, the parties discussed arrangements for transporting him to the jury view. At that time, the court explained that Spaulding would be transported separately in a van with blacked-out windows and that he would stay inside the van during the jury view. Defense counsel assented to this procedure, noting "that's the way it's always done or has been done."

**{¶ 104}** But even if Spaulding did not attend the jury view, he cannot show that he was prejudiced by his alleged absence. *See Were* at ¶ 98. Defense counsel were present to represent his interests, and they told the court that nothing improper had occurred during the jury view. Under these circumstances, we cannot conclude at this time that Spaulding was deprived of due process or effective assistance of counsel.

**{¶ 105}** Finally, Spaulding argues that his due-process rights were violated because the trial judge did not attend the jury view and that his counsel were ineffective for waiving the judge's presence. As other courts have noted, it is "generally considered desirable" to have a trial judge's oversight during a jury view. *Devin v. DeTella*, 101 F.3d 1206, 1210 (7th Cir.1996); *accord Clemente v. Carnicon-Puerto Rico Mgt. Assocs.*, 52 F.3d 383, 386 (1st Cir.1995), *abrogated on other grounds*, *United States v. Gray*, 199 F.3d 547, 548 (1st Cir.1999). However, a judge's absence does not automatically violate due process; instead, it is necessary to review "the record as a whole to determine whether the circumstances under which the jury view was conducted can be said to have denied [the defendant] a fair trial." *Devin* at 1209. And that analysis occurs against the backdrop of our holding that a jury's "view of a crime scene is neither evidence nor a crucial stage in the

proceedings." *State v. Richey*, 64 Ohio St.3d 353, 367, 595 N.E.2d 915 (1992), *overruled on other grounds*, *State v. McGuire*, 80 Ohio St.3d 390, 402-404, 686 N.E.2d 1112 (1997).

{¶ 106} Here, we reject Spaulding's claims for two reasons. First, the record suggests that the judge *did* accompany the jury to 1104 Grant Street. The transcript states, "The court, counsel, and jury proceeded to view the premises." Second, Spaulding has failed to show how the judge's alleged absence prejudiced him. The record indicates that the bailiff was the only person to address the jury during the jury view, and she followed a written script that defense counsel had preapproved. In addition, the day after the jury view, defense counsel told the court that nothing improper had occurred at the jury view. Thus, the judge's alleged absence did not violate Spaulding's constitutional rights.

{¶ 107} Proposition of law No. 3 fails.

### *2. Prior bad acts*

{¶ 108} In proposition of law No. 6, Spaulding asserts that "much—if not the majority—of" the state's evidence at trial "concerned showing the jury that [he] is a career criminal and all-around bad human being." He then cites specific evidence of four "prior bad acts" and argues that it was inadmissible.[5] Spaulding also contends that his trial counsel were constitutionally ineffective because they did not object to this evidence.

### a. Evid.R. 404(B)

{¶ 109} "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Evid.R. 404(B). However, this evidence may be admissible for other purposes,

---

[5] Spaulding also cites six journal entries documenting prior convictions and argues that they were improperly admitted. The admission of these exhibits is discussed below, in our analysis of proposition of law Nos. 9 and 10.

such as to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.*; *accord* R.C. 2945.59.

{¶ 110} A trial court has broad discretion in deciding whether to admit or exclude other-acts evidence. *See State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 67. Thus, ordinarily we defer to a trial court's evidentiary ruling unless the court "has clearly abused its discretion and the defendant has been materially prejudiced thereby." *State v. Hymore*, 9 Ohio St.2d 122, 128, 224 N.E.2d 126 (1967). However, when a defendant fails to object to evidence at trial—as here—we review the claim for plain error only. *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 70.

### b. Alleged events of November 28, 2011

{¶ 111} Spaulding argues that the trial court erred by admitting evidence of the alleged events at Singleton's apartment on November 28, 2011, because he was not charged with any crimes related to that incident in this case.

{¶ 112} At trial, Officer Woofter testified that he responded to Singleton's 9-1-1 call on November 28. Singleton had reported that an unwanted guest was in her apartment with a gun. According to Woofter, Singleton was hysterical. She was yelling and screaming and said that the man—whom she later identified as Spaulding—was still on the property and that he had threatened "to kill her as revenge for having him arrested in the past." Jeff Cutler, Spaulding's probation officer, also testified that Singleton called him on November 29 to report Spaulding's break-in. Cutler later verified that police had issued a warrant for Spaulding's arrest after the incident.

{¶ 113} Although criminal charges for the November 28 incident were not part of this case, the trial court properly admitted evidence of Singleton's reports about the incident and the outstanding warrant for Spaulding's arrest. This evidence was directly relevant to one of the capital specifications attached to Singleton's aggravated-murder count—that Spaulding murdered her to prevent her

testimony about another criminal act. R.C. 2929.04(A)(8). And these events provided both context and a potential motive for the murders and other crimes that Spaulding was charged with committing. *See* Evid.R. 404(B) (other-acts evidence may be admitted to prove motive, intent, and absence of mistake or accident).

{¶ 114} This evidence was also relevant to prove an element of Count 7, menacing by stalking. Under R.C. 2903.211(A)(1), the state had to establish that Spaulding "engag[ed] in a pattern of conduct" that "knowingly cause[d]" Singleton to believe that he would cause her physical harm or mental distress. Thus, his past domestic violence was relevant to prove both a pattern of conduct and also that he knew that his conduct would cause Singleton to believe that he was going to harm her. *Horsley*, 10th Dist. Franklin No. 05AP-350, 2006-Ohio-1208, at ¶ 25. "Other acts evidence can be particularly useful in prosecutions for menacing by stalking because it can assist the jury in understanding that a defendant's otherwise innocent appearing acts, when put into the context of previous contacts he has had with the victim, may be knowing attempts to cause mental distress." *Bilder*, 99 Ohio App.3d at 658, 651 N.E.2d 502; *see State v. Hart*, 12th Dist. Warren No. CA2008-06-079, 2009-Ohio-997, ¶ 12 ("In prosecutions for menacing by stalking, the victim's belief that the defendant will cause physical harm is an element of the offense which is often intertwined with their past interactions").

{¶ 115} Moreover, to the extent that Spaulding is challenging Singleton's statements to Officers Woofter and Cutler as inadmissible hearsay, his argument fails. The trial court could reasonably have concluded that Singleton's statements to Woofter were excited utterances, *see* Evid.R. 803(2), since he testified that she was in a hysterical state. More importantly, Singleton's statements to both Woofter and Cutler were not introduced for their truth, i.e., to prove Spaulding's guilt of a crime committed on November 28. Instead, they were introduced to show that Singleton had expressed fear of Spaulding and was attempting to enlist protection from law enforcement.

{¶ 116} The trial court did not err by admitting this evidence.

### c. 2011 domestic-violence conviction

{¶ 117} Spaulding next challenges the admission at trial of evidence of his July 2011 conviction for felony domestic violence against Singleton. Cutler testified that Spaulding came under his supervision after receiving a three-year suspended sentence for the offense, but he did not provide any details about the nature of the incident.

{¶ 118} This testimony was properly admitted because Spaulding's July 2011 conviction was not just other-acts evidence; it was proof of an element of Count 6. To convict Spaulding of third-degree-felony domestic violence, the state had to prove that he had two or more prior domestic-violence convictions. R.C. 2919.25(D)(4); *see State v. Harrington*, 3d Dist. Logan No. 08-01-20, 2002-Ohio-2190, ¶ 10 ("When a prior offense acts to transform a crime by increasing its degree, the prior offense becomes an element of the crime and must be proven by the State beyond a reasonable doubt"). The state may prove a prior conviction by introducing a judgment entry—including the defendant's sentence, *see* R.C. 2945.75(B)(1)—but that is not "the *only* method to prove it." (Emphasis sic.) *State v. Gwen*, 134 Ohio St.3d 284, 2012-Ohio-5046, 982 N.E.2d 626, ¶ 14.

{¶ 119} Moreover, even if the evidence were not admissible for this purpose, Spaulding's past domestic violence against Singleton was relevant to proving Count 7, menacing by stalking. The 2011 conviction supported the state's claim that Spaulding "knew that his conduct would cause the victim to believe that [he] was going to harm [her]." *Horsley*, 10th Dist. Franklin No. 05AP-350, 2006-Ohio-1208, at ¶ 25.

{¶ 120} The trial court did not err by allowing Cutler to testify about the 2011 conviction.

### d. 2010 domestic-violence convictions

{¶ 121} Spaulding also challenges Detective McGee's testimony about the theft of Singleton's car radio in April 2010 and Spaulding's related convictions for domestic violence and telecommunications harassment. He asserts that "[e]ssentially all" of McGee's testimony on direct examination was "hearsay from Singleton accusing Spaulding of various criminal acts and civil torts."

{¶ 122} Detective McGee responded to two 911 calls from Singleton on April 18, 2010. He testified that she was very distraught and initially too scared to tell him that she suspected Spaulding. Later, she revealed that Spaulding had been repeatedly contacting her since the night before; he had sent more than 30 text messages and had left several voicemail messages, three of which McGee recorded. McGee described some of the text messages as "very threatening" and recalled one that said, "This radio is going to look good in my car." Spaulding spoke to McGee on Singleton's phone and advised him, "Tell that bitch I got something for her." According to McGee, Singleton was concerned that Spaulding might follow her—especially since he knew her car. She said that Spaulding had "all kinds of guns" and that she believed that he "shoots people up." Spaulding was convicted of domestic violence and telecommunications harassment for the incident.

{¶ 123} Evidence of this incident was admissible for the same reasons that evidence of Spaulding's conviction for the July 2011 domestic violence against Singleton was. As explained above, to convict Spaulding of third-degree-felony domestic violence, the state had to prove that he had two or more prior domestic-violence convictions. R.C. 2919.25(D)(4); *see Harrington*, 3d Dist. Logan No. 08-01-20, 2002-Ohio-2190, at ¶ 10. And to prove menacing by stalking, the state had to establish that Spaulding knew that his conduct would cause Singleton to believe that he was going to harm her. *Horsley*, 10th Dist. Franklin No. 05AP-350, 2006-Ohio-1208, at ¶ 25. The details of the April 2010 incident were relevant to proving this element of Count 7.

{¶ 124} Moreover, to the extent that Spaulding is challenging Singleton's statements to Detective McGee on hearsay grounds, his argument fails. The trial court could reasonably could have concluded that Singleton's statements were excited utterances, *see* Evid.R. 803(2), since McGee testified that she was distraught, upset, and afraid. And, more importantly, these statements were not offered to prove Spaulding's guilt of a crime committed in April 2010. Instead, they were introduced for a nonhearsay purpose: to show that Singleton had expressed fear of Spaulding.

{¶ 125} Under the circumstances, this evidence was not erroneously admitted.

### e. 2001 domestic-violence conviction

{¶ 126} Spaulding next objects to Officer Christopher Church's testimony about Spaulding's 2001 conviction for domestic violence against his mother and sister. Church, who responded to a 9-1-1 call in July 2001, testified that "Mr. Spaulding's sister stated that [he] had slapped her in the face, knocked off her glasses; and Mr. Spaulding's mother stated that he had threatened her." While Church was at the scene, he heard Spaulding say to his mother, in the context of discussing her decision to call the police, "We'll see what happens to you." Spaulding was convicted of domestic violence and sentenced to 30 days of daily reporting.

{¶ 127} Like Spaulding's 2010 and 2011 domestic-violence convictions, his 2001 conviction went to an element of the current domestic-violence charge against him. To convict on Count 6, the state had to prove at least two prior domestic-violence convictions. R.C. 2919.25(D)(4); *see Harrington*, 3d Dist. Logan No. 08-01-20, 2002-Ohio-2190, at ¶ 10. And the 2001 conviction was also relevant to Count 7, because menacing by stalking is elevated to a fourth-degree felony if the state proves that "[t]he offender has a history of violence toward the victim or any other person or a history of other violent acts toward the victim or

any other person." R.C. 2903.211(B)(2)(e). Thus, the fact of the 2001 conviction was relevant and admissible.

{¶ 128} Nevertheless, the state did not need to introduce evidence of the facts underlying the 2001 conviction for either of these purposes. Unlike the details of Spaulding's past domestic violence against Singleton, the details of this offense are not probative of whether she believed that Spaulding would cause her physical harm. Officer Church described his recollection of the underlying offense—which had occurred 11 years earlier—and testified to hearsay statements from Spaulding's mother and sister. Under these circumstances, the risk that the jury may have been "prejudicially influenced by details of the prior crime" clearly outweighed any probative value of the evidence. *Harrington* at ¶ 23. For these reasons, evidence about the details of the 2001 offense should have been excluded.

{¶ 129} Even so, this does not rise to the level of plain error. Because ample other evidence supported Spaulding's convictions, he cannot establish that the erroneous introduction of this evidence affected his substantial rights.

**f. Ineffective assistance of counsel**

{¶ 130} Finally, Spaulding contends that trial counsel provided ineffective assistance by failing to object to other-acts evidence. As explained above, all but one of Spaulding's evidentiary claims fail. Thus, counsel were not deficient for failing to object to that testimony. *See State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 159. Furthermore, Spaulding cannot establish that "but for" the admission of evidence about the 2001 domestic-violence incident, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052, 80 L.Ed.2d 674. Accordingly, his *Strickland* claim fails.

{¶ 131} For these reasons, we reject proposition of law No. 6.

### 3. *Magistrates' testimony*

{¶ 132} In proposition of law No. 7, Spaulding argues that the trial court erred by allowing the two magistrates to describe Singleton's testimony during the

ex parte domestic-relations hearings held in August and December 2011. He contends that the magistrates improperly testified about his bad character and prior bad acts and that they also vouched for Singleton's credibility. Relatedly, he claims that trial counsel were constitutionally ineffective because they did not object to this testimony.

### a. Factual background

{¶ 133} At trial, the state introduced testimony from two magistrates from the domestic-relations division of the Summit County Court of Common Pleas. Magistrates Tracy Stoner and Stephan Bennett Collins explained that they presided over ex parte hearings at which Singleton gave sworn testimony about Spaulding's acts of domestic violence. According to Magistrate Stoner, in August 2011, Singleton testified about "various things that had caused her to be in fear." Singleton told Stoner that Spaulding had threatened her with a gun and also had threatened her mother and sister. Several months later, on December 1, 2011, Singleton testified before Magistrate Collins. According to Collins, she "gave some pretty compelling testimony as to the nature of the violence that she had experienced" at Spaulding's hands. Collins stated that he "[v]ery much" found Singleton's testimony persuasive.

{¶ 134} Magistrates Stoner and Collins each issued a one-year protection order, meaning that they had found by a preponderance of the evidence that domestic violence had occurred. At trial, the magistrates explained the terms of their orders and testified that the orders were later dismissed because Singleton failed to appear at a final hearing, during which Spaulding would have had an opportunity to contest her claims. The state introduced copies of both orders at trial, each redacted to exclude Singleton's narrative account.[6]

---

[6] The state argues that it had to call the magistrates as witnesses because Spaulding "refused to stipulate to the existence of the civil protection order" he was charged with violating until they testified. But the record is silent as to whether Spaulding would have entered a stipulation to the orders.

**{¶ 135}** Spaulding did not object to any part of Magistrate Stoner's or Magistrate Collins's testimony at trial.

### b. Standard of review

**{¶ 136}** Spaulding urges us to conclude that the magistrates' testimony was a structural error. Structural error is not " 'simply an error in the trial process itself' "; instead, it "is a 'defect affecting the framework within which the trial proceeds.' " *Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, at ¶ 50, quoting *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). A structural error "permeate[s] '[t]he entire conduct of the trial from beginning to end.' " *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 17, quoting *Fulminante* at 309.

**{¶ 137}** We have never recognized judicial testimony as structural error, and Spaulding offers no persuasive reason why we should do so now. *See McCaffrey v. State*, 105 Ohio St. 508, 513, 138 N.E. 61 (1922) (reviewing judge's testimony during the trial he was presiding over and determining that no prejudice occurred). Accordingly, we review this proposition of law for plain error. *See State v. Davis*, 127 Ohio St.3d 268, 2010-Ohio-5706, 939 N.E.2d 147, ¶ 2-3.

### c. Analysis

**{¶ 138}** At bottom, Spaulding asserts that it was improper for the magistrates to testify because the jury may have assigned greater weight to their testimony than that of other witnesses.

**{¶ 139}** It is prudent to avoid judicial testimony in criminal cases when possible, for the sake of both preserving judicial integrity and avoiding the risk of unduly influencing jurors. *See Hirschberger v. Silverman*, 80 Ohio App.3d 532, 540, 609 N.E.2d 1301 (6th Dist.1992); *State v. Johnson*, 4th Dist. Ross No. 94 CA 2004, 1995 WL 764319, *3 (Dec. 26, 1995). But regardless of whether the trial court should have excluded the magistrates' testimony, we are unpersuaded that it resulted in "a manifest miscarriage of justice." *Long*, 53 Ohio St.2d 91, 372 N.E.2d

804, at paragraph three of the syllabus. Magistrates Stoner and Collins provided few details about the events underlying Singleton's requests for protection orders. And Spaulding stipulated to the introduction of the protection orders. Thus, the magistrates' testimony was not outcome determinative for any of Spaulding's convictions.

{¶ 140} Spaulding's concern that the magistrates improperly vouched for Singleton, thereby bolstering the deceased victim's credibility with the jury, similarly does not rise to the level of plain error. The fact that the magistrates issued civil protection orders—which are part of the record—itself proves that they accepted Singleton's testimony as credible; a magistrate must find by a preponderance of the evidence that domestic violence occurred before issuing an order. Magistrate Collins's statement that he "very much" found Singleton's testimony compelling does suggest that he was persuaded by *more* than a mere preponderance of the evidence. But, even so, without more, Collins's testimony was not outcome determinative.

{¶ 141} For the same reasons that Spaulding cannot establish plain error, his ineffective-assistance-of-counsel claim also fails. That is, even assuming that trial counsel should have objected to the magistrates' testimony, the error was not outcome determinative. *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 142} For all these reasons, we reject Spaulding's seventh proposition of law.

### 4. Proof of prior convictions

{¶ 143} In proposition of law Nos. 9 and 10, Spaulding argues that the trial court erred by admitting journal entries of his prior criminal convictions, in violation of *Old Chief v. United States*, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997). Relatedly, he asserts that his trial counsel were constitutionally ineffective for failing to object to the entries or seek a stipulation.

### a. Factual background

{¶ 144} Spaulding was charged with two counts that were predicated on his convictions for prior offenses: Count 5, having weapons while under disability in violation of R.C. 2923.13(A), and Count 6, third-degree-felony domestic violence in violation of R.C. 2919.25(A). To return a guilty verdict on Count 5, the jury had to find that Spaulding was "under indictment for or ha[d] been convicted of any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse." R.C. 2923.13(A)(3).[7] And to convict him of third-degree-felony domestic violence, the jury had to find that Spaulding had previously "pleaded guilty to or been convicted of two or more offenses of domestic violence" or other specified acts that are substantially similar to domestic violence. R.C. 2919.25(D)(4).

{¶ 145} At trial, the state introduced two journal entries recording Spaulding's prior convictions for trafficking in illegal drugs, R.C. 2925.03(A)(2). The first, dated March 22, 2002, recorded his guilty plea to trafficking in marijuana and his sentence to 18 months of community control. The second, dated December 13, 2002, indicates that Spaulding pled guilty to trafficking in cocaine and marijuana and was sentenced to concurrent prison terms of 12 months and 10 months.

{¶ 146} The state also introduced three journal entries for prior domestic-violence convictions. The first, dated July 12, 2001, recorded Spaulding's guilty plea to domestic violence and domestic-violence menacing. He was fined and ordered to have no contact with his mother or sister. The second, dated May 18,

---

[7] Count 5 cites R.C. 2923.13(A)(1), which prohibits a "person [who] is a fugitive from justice" from carrying a firearm. However, this citation appears to be an error. The indictment alleges that Spaulding had a prior felony conviction "involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse," language that actually tracks R.C. 2923.13(A)(3). Likewise, when the jury convicted Spaulding of Count 5, it specifically found that he knowingly used a handgun and "was previously convicted of a felony offense involving the illegal trafficking in any drug of abuse."

2010, recorded Spaulding's first conviction for domestic violence against Singleton. He was fined $200 and received a ten-day suspended sentence. The state also introduced a judgment entry, issued the same day, recording Spaulding's conviction for telecommunications harassment. The last entry, dated July 29, 2011, recorded Spaulding's guilty plea to third-degree-felony domestic violence. He received a three-year prison sentence that was suspended on the condition that he complete three years of community control. The court ordered Spaulding to have no unlawful contact with Singleton and prohibited him from visiting his children outside the presence of a neutral third party.

{¶ 147} The jury convicted Spaulding of Counts 5 and 6. The verdict forms included findings that Spaulding had been convicted of a prior felony offense involving illegal drug trafficking and specific findings that he had been convicted of domestic violence in the three cases described above.

### b. *Old Chief*

{¶ 148} Spaulding argues that under *Old Chief*, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574, "[d]efendants have a right to stipulate to prior convictions— when those prior convictions enhance the level of the offense." Thus, he maintains that the trial court erred by admitting journal entries of his prior convictions.

{¶ 149} In *Old Chief*, the defendant was charged with violating a federal statute that prohibited possession of a firearm by anyone who had been convicted of a felony offense. *Id.* at 174; 18 U.S.C. 922(g)(1). At trial, Old Chief argued that his offer to stipulate to his convict status rendered "the name and nature of [his earlier] offense"—assault causing serious bodily injury—"inadmissible under Rule 403 of the Federal Rules of Evidence, the danger being that unfair prejudice from that evidence would substantially outweigh its probative value." *Old Chief* at 175. The prosecutor refused to join in the stipulation, and the trial court overruled Old Chief's Fed.R.Evid. 403 objection. *Old Chief* at 177.

**{¶ 150}** On appeal, the United States Supreme Court held that the trial court had abused its discretion by rejecting Old Chief's offer to stipulate and "admit[ting] the full record of a prior judgment." *Id.* at 174. The court explained that "the name or nature of the prior offense raises the risk of a verdict tainted by improper considerations" and that "the purpose of the evidence [was] solely to prove the element of prior conviction." *Id.* Moreover, the probity of the official record of Old Chief's conviction was significantly diminished because there was "no cognizable difference between [its] evidentiary significance" and that of Old Chief's admission. *Id.* at 191. The court warned that the risk of unfair prejudice to a defendant is "substantial whenever the official record offered by the Government would be arresting enough to lure a juror into a sequence of bad character reasoning." *Id.* at 185.

**{¶ 151}** But *Old Chief* does not categorically prohibit trial courts from admitting judgment entries offered to prove a conviction. Instead, it constrains a trial court's discretion under Fed.R.Evid. 403 when a defendant is charged with a crime—one element of which is the fact of a prior felony conviction—*and* the court is presented with an alternative means of proving the prior conviction—namely, a stipulation. Under those circumstances, a trial court must exclude the judgment entry.

**{¶ 152}** This court has yet to decide whether *Old Chief*'s reasoning applies only to federal prosecutions or also extends to state-law prosecutions in Ohio, although the court has accepted review of this question, *see State v. Creech*, 142 Ohio St.3d 1421, 2015-Ohio-1353, 28 N.E.3d 121, which is currently pending in this court. We need not resolve this issue here, however, because Spaulding's reliance on *Old Chief* is unpersuasive for another reason: his trial counsel did not offer to stipulate to his convictions or object to the admission of the judgment entries.

**c. Ineffective assistance of counsel**

{¶ 153} Spaulding next argues that his trial counsel were constitutionally ineffective for not objecting to the journal entries or offering to stipulate to his prior convictions. But even assuming that counsel should have objected to the judgment entries or offered to stipulate to the convictions, Spaulding has not established a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052, 80 L.Ed.2d 674. If Spaulding had stipulated to his prior offenses, the jury still would have learned that he had at least prior felony drug convictions and prior domestic-violence convictions. *See* R.C. 2923.13(A) (to convict, the state had to prove that Spaulding had been previously convicted of a felony *drug offense*); R.C. 2919.25 (to convict Spaulding of third-degree-felony domestic violence, the state had to prove that he had been convicted of two or more prior *domestic-violence* offenses). And other witnesses testified about the incidents underlying the domestic-violence convictions.

{¶ 154} We reject proposition of law Nos. 9 and 10.

### 5. *Domestic-violence expert*

{¶ 155} Proposition of law No. 8 challenges Dana Zedak's testimony about domestic violence on the grounds that she did not testify as either an expert or a lay witness but instead offered what Spaulding calls "pseudo-expert" opinions. According to Spaulding, this testimony violated his right to a fair trial and his counsel provided constitutionally ineffective assistance by not objecting to it.

**a. Factual background**

{¶ 156} Zedak testified that she is the director of community relations at a battered-women's shelter. The shelter serves victims of domestic violence by providing shelter, advocacy, prevention, and education services. Zedak also has experience as the director of services at the same shelter and at a rape crisis center. She is a licensed social worker, holds a bachelor of arts degree in psychology, and

has lectured widely on domestic violence. According to Zedak, she has worked with thousands of domestic-violence and sexual-assault victims and has testified as a domestic-violence expert in about a dozen trials.

{¶ 157} After Zedak described her credentials, the following exchange occurred:

> [Prosecutor]: At this time, Your Honor, I would ask that she be qualified as an expert pursuant to the rule.
>
> Court: Just ask your questions.

Zedak then went on to testify, without defense objection, about the typical cycle of domestic violence, male privilege, the "power and control wheel," and common misconceptions regarding domestic violence.

### b. Analysis

{¶ 158} Spaulding asserts that because Zedak had "neither been qualified as an expert witness, nor ha[d] direct, personal knowledge of" the facts of the case, she was not competent to testify as *either* an expert witness or a lay witness. *See* Evid.R. 701 (lay witness testimony); Evid.R. 702 (expert testimony).

{¶ 159} Defense counsel did not object to Zedak's testimony or challenge her qualifications to testify at trial, so Spaulding has waived all but plain error. *See State v. Hartman*, 93 Ohio St.3d 274, 286, 754 N.E.2d 1150 (2001). We have found no plain error when a witness testifies as an expert as long as the witness satisfies the three requirements for testifying as an expert under Evid.R. 702. *See, e.g.*, *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 153 (failure to tender the witness as an expert "was of no consequence" in light of his qualifications); *Hartman* at 285-288 (no plain error when state had failed to tender four witnesses as experts, but they were qualified to give expert testimony).

{¶ 160} Here, Zedak's testimony was consistent with Evid.R. 702: (1) she testified about matters beyond the knowledge or experience of lay persons, (2) she had extensive experience, training, and education involving domestic-violence issues, and (3) she based her testimony on widely recognized information about domestic violence and abuse.

{¶ 161} Moreover, even if any aspect of Zedak's testimony were questionable, it did not affect the outcome of Spaulding's trial. "Given the other evidence in the record and the fact that [her] testimony was phrased in terms of generalities," *State v. Frazier*, 9th Dist. Summit No. 25654, 2012-Ohio-790, ¶ 65, Spaulding cannot meet his burden to establish prejudice—or, therefore, plain error—under *Strickland*.

{¶ 162} For these reasons, we reject proposition of law No. 8.

### 6. Crim.R. 29

{¶ 163} In proposition of law No. 11, Spaulding argues that the trial court erred by denying his Crim.R. 29 motion. Specifically, he contends that the court should have dismissed the attempted-murder and aggravated-murder charges.

{¶ 164} "A motion for acquittal under Crim.R. 29(A) is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 165} Spaulding contends that no rational trier of fact could have concluded that he was responsible for attempted murder or either of the charged aggravated murders because Griffin did not identify him as the shooter during his first viewing of the photo array. But, as explained in our analysis of proposition of law No. 2, Spaulding has failed to make a persuasive argument that Griffin's later

identifications of him as the shooter should have been suppressed. It is not the province of this court to afford less weight to Griffin's subsequent testimony implicating Spaulding. Instead, "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.

{¶ 166} Because Spaulding's arguments ultimately go to weight and credibility, he has failed to establish that Griffin's testimony was insufficient to support his convictions for attempted murder and aggravated murder, especially when considered against the backdrop of other evidence at trial. The jury also heard testimony from Todd Wilbur that he saw Spaulding with Singleton and Thomas at 1104 Grant Street around 8:00 a.m. on December 15, 2011, only moments before Wilbur heard popping sounds. And ballistics evidence indicated that the same weapon was fired during both incidents. As such, the jurors could reasonably have found sufficient evidence to convict Spaulding of attempted murder and of both charges of aggravated murder even in the absence of Griffin's identification.

{¶ 167} We reject proposition of law No. 11.

### E. Sentencing Phase

#### *1. Ineffective assistance of counsel*

{¶ 168} In proposition of law No. 12, Spaulding asserts that his trial counsel provided ineffective assistance during the mitigation phase.

#### a. Mitigation specialist

{¶ 169} Spaulding protests that trial counsel never hired a mitigation specialist, even though the trial court awarded funds for one. But we have held that hiring a mitigation specialist is not "a requirement of effective assistance" of counsel. *McGuire*, 80 Ohio St.3d at 399, 686 N.E.2d 1112. And Spaulding cannot establish that trial counsel's performance in this regard was deficient or prejudicial for several reasons.

{¶ 170} Spaulding's trial counsel did not retain an expert with the formal title of "mitigation specialist," but they did hire two experts—Dr. John Fabian, a forensic psychologist and clinical neuropsychologist, and Susan Moran, an attorney—with the intention that they would perform the functions of a mitigation specialist. Trial counsel also retained an investigator, Thomas Fields. The team interviewed members of Spaulding's family, gathered records, and performed psychological testing. At the mitigation phase, trial counsel presented testimony from four family members and Spaulding's unsworn statement. And Moran sat at counsel table with the defense. Given the work performed by Fabian, Moran, and Fields in preparation for and during the mitigation phase, trial counsel's failure to hire someone with the title of "mitigation specialist" did not amount to deficient performance, at least on this record.

{¶ 171} Moreover, Spaulding cannot prove that he was prejudiced by trial counsel's failure to hire a mitigation specialist. He does not identify any specific information that a mitigation specialist would have uncovered that had not already been found by the defense expert or explain how that information would have prompted the jury to recommend a life sentence. In fact, it would be impossible to make such a showing without relying on evidence outside the record, and that is not permissible in a direct appeal, *State v. Keith*, 79 Ohio St.3d 514, 536-537, 684 N.E.2d 47 (1997).

### b. Failure to present psychological evidence

{¶ 172} Spaulding also argues that trial counsel provided ineffective assistance because they did not have Dr. Fabian testify during the mitigation phase or submit as evidence a 27-page report that he had prepared in advance of the mitigation phase.

{¶ 173} According to his report, which was ultimately submitted to the court under seal, Dr. Fabian met with Spaulding seven times to conduct a forensic psychological and neuropsychological examination. Testing indicated that

Spaulding has a full-scale IQ of 89, and he performed at an 11th-grade equivalent on the Woodcock-Johnson Performance Test. Fabian also reviewed information from interviews with Spaulding and five of his family members as well as Spaulding's academic history, criminal history, and prison records. Fabian stated, however, that he "would have preferred to have more time to interview other half-siblings of Mr. Spaulding that were not able to be interviewed due to their inability to be located or their out-of-state status."

{¶ 174} Dr. Fabian's report included a detailed description of Spaulding's family history and background. The report identified "potential psychosocial factors that may be mitigating and relevant in this case." Fabian opined that Spaulding has a severe personality disorder marked by antisocial, borderline, and paranoid traits. He stated that Spaulding also exhibits evidence of a mood disorder (long-term mild clinical depression) and may suffer from posttraumatic stress disorder due to his experiences on the streets with violence, drugs, and theft. Fabian also noted Spaulding's consistent and intense dependence on cannabis.

{¶ 175} At the mitigation hearing, defense counsel did not ask Dr. Fabian to testify or submit his written report to the jury. Instead, they asked the court to include the report in the record, under seal. Spaulding now objects that trial counsel were deficient in both regards.

{¶ 176} Trial counsel's decision not to present psychological evidence in mitigation appears debatable, given the contents of Dr. Fabian's report. But we have long recognized that "the presentation of mitigating evidence is a matter of trial strategy," *Keith*, 79 Ohio St.3d at 530, 684 N.E.2d 47, even if counsel's chosen strategy "prove[s] unsuccessful," *State v. Frazier*, 61 Ohio St.3d 247, 255, 574 N.E.2d 483 (1991). As long as counsel makes a strategic decision "after thorough investigation of law and facts relevant to plausible options," the decision is "virtually unchallengeable." *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052, 80 L.Ed.2d 674. Thus, even "[d]ebatable trial tactics generally do not constitute

ineffective assistance of counsel." *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 116.

{¶ 177} Here, Spaulding does not assert that counsel's failure to present psychological testimony was a product of incomplete investigation. Instead, he points to Dr. Fabian's report as proof of the useful evidence the defense *could* have presented at the mitigation phase. Because counsel were fully aware of Fabian's findings and the contents of his report, their decision not to introduce this evidence as mitigation is " 'virtually unchallengeable.' " *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 158, quoting *Strickland* at 690.

### c. Inadequate preparation

{¶ 178} Spaulding, in his reply brief, more broadly contends that defense counsel and their experts were unprepared for the mitigation phase.

{¶ 179} "Appellate courts generally will not consider a new issue presented for the first time in a reply brief." *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 18. But regardless, Spaulding's allegations do not prove ineffective assistance. Spaulding includes several references to a hearing that occurred ten days after the jury returned guilty verdicts. At the hearing, defense counsel asked to postpone the mitigation hearing to allow for further preparations, and the trial court agreed. The mitigation hearing did not begin until more than two months later. Under these circumstances, the status of defense preparations on November 19, 2012, hardly proves that trial counsel were unprepared for the mitigation phase on January 29, 2013.

{¶ 180} For these reasons, we reject proposition of law No. 12.

### 2. Proportionality

{¶ 181} In proposition of law No. 13, Spaulding contends that his death sentence is unconstitutional because the trial court did not "evaluate [it] for proportionality in relation to other heinous crimes." This claim fails for three reasons.

{¶ 182} First, contrary to Spaulding's claims, R.C. 2929.05(A) does not require a *trial court* to engage in proportionality review. Instead, this provision requires an *appellate court* to review every death sentence for proportionality. By contrast, R.C. 2929.03(F) sets forth the requirements for a trial court's sentencing opinion in a capital case. This provision says nothing about the trial court conducting a proportionality analysis.

{¶ 183} Second, we have previously rejected the claim that proportionality requires analysis of all indictments charging capital specifications, as opposed to only cases in which the death penalty was imposed. *State v. Steffen*, 31 Ohio St.3d 111, 123, 509 N.E.2d 383 (1987).

{¶ 184} Finally, we will review Spaulding's sentence for proportionality as part of our independent sentence evaluation, as required by R.C. 2929.05(A).

{¶ 185} For these reasons, we reject proposition of law No. 13.

### F. Cumulative Error

{¶ 186} In proposition of law No. 14, Spaulding urges us to reverse his convictions on the grounds that the cumulative effect of his trial counsel's errors rises to the level of constitutionally ineffective assistance. However, because none of Spaulding's individual claims of ineffective assistance has merit, he cannot establish a *Strickland* violation "simply by joining those claims together." *Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, at ¶ 173; *accord State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, ¶ 177 (" 'sheer weight of numbers' " does not render errors prejudicial), quoting *State v. Hill*, 75 Ohio St.3d 195, 212, 661 N.E.2d 1068 (1996).

{¶ 187} Accordingly, we reject proposition of law No. 14.

### G. Independent Sentence Evaluation

{¶ 188} We now independently review Spaulding's death sentence for appropriateness and proportionality. R.C. 2929.05(A). In conducting this review, we must determine whether the evidence supports the jury's finding of an

aggravating circumstance, whether the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt, and whether Spaulding's death sentence is proportionate to those affirmed in similar cases. *Id.*

### 1. Aggravating circumstances

{¶ 189} The jury convicted Spaulding of two counts of aggravated murder, each with a single capital specification under R.C. 2929.04(A)(5). At sentencing, the jury considered only one aggravating circumstance: that the aggravated murders and the attempted murder were part of a single course of conduct that involved the purposeful killing or attempt to kill two or more persons.

{¶ 190} The evidence at trial supports the jury's course-of-conduct finding beyond a reasonable doubt. Singleton, Thomas, and Griffin were each shot once in the back of the head or neck, just outside Thomas's home at 1104 Grant Street. The shootings all occurred on December 15, 2011, within hours of each other. Police recovered shell casings from both incidents and determined that they had been fired from the same weapon, a 9-mm Luger. The only surviving victim, Griffin, identified his assailant as Spaulding. And Todd Wilbur testified that he saw a man, later identified as Spaulding, at 1104 Grant Street speaking to an African-American man and woman around 8:00 a.m. on December 15. As Wilbur drove away, he heard a "pop and then pop." Thus, the jury properly considered this aggravating circumstance at sentencing.

### 2. Mitigating factors

{¶ 191} We must weigh the above aggravating circumstance against any mitigating evidence about "the nature and circumstances of the offense" and Spaulding's "history, character, and background." R.C. 2929.04(B). In addition, we must consider the statutory mitigating factors under R.C. 2929.04: (B)(1) (victim inducement), (B)(2) (duress, coercion or strong provocation), (B)(3) (mental disease or defect), (B)(4) (youth), (B)(5) (lack of significant criminal history), (B)(6) (accomplice only), and (B)(7) (any other relevant factors).

### a. Spaulding's mitigation hearing

{¶ 192} The defense presented four mitigation witnesses and Spaulding's unsworn statement. The state presented a single rebuttal witness.

*1. Phyllis Spaulding Lewis*

{¶ 193} Spaulding's aunt, Phyllis Spaulding Lewis, testified that she had five siblings. Her youngest brother, William Baker Spaulding, had 11 children by five different women. William's youngest children were Spaulding and his sister, Kamilah Spaulding.

{¶ 194} Spaulding and Kamilah grew up living with William and their mother, Betty Spaulding. Over the years, they relocated four or five times and lived in metropolitan housing part of the time. William worked hard as a truck driver to support his family. But he was not always able to pay the bills, especially because of child-support payments. When William was diagnosed with cancer, he had to stop working.

{¶ 195} According to Phyllis, Spaulding was a good and loving child. He was smart and graduated from high school. Spaulding's mother was a strict disciplinarian, but William was more like a friend to him. William devoted a lot of attention to Spaulding and was close to him. By contrast, William had not paid much attention to his older children, many of whom lived in Detroit.

{¶ 196} Spaulding looked up to Ronnie Spaulding, his half-brother, and spent a lot of time with him. Ronnie introduced Spaulding to drugs, and eventually they sold drugs together. Ronnie, a cocaine user, was in and out of jail for drug offenses. He died in a car accident in August 2009.

{¶ 197} In April 2010, Spaulding's father died. According to Phyllis, at that point, Spaulding "flipped out" and became "a different person." "He felt kind of like God had let him down * * *." He became disrespectful toward his mother and his sister, Kamilah, and began to use more drugs.

50

**{¶ 198}** Phyllis emphasized that Spaulding loved Singleton and loves his children. Spaulding and Singleton were sometimes aggressive toward each other, but Spaulding did not become "a monster" until he began using drugs after his father died. But, on cross-examination, the state established that Spaulding's convictions for domestic violence and drug trafficking long preceded his father's death.

**{¶ 199}** Phyllis asked the jury to spare Spaulding's life and said she thought he would change if sentenced to life in prison.

### 2. *Earl Spaulding*

**{¶ 200}** Earl Spaulding, Spaulding's half-brother, testified that he moved back and forth between Akron and Detroit as he was growing up. At different times, he lived with his mother, her parents, and his father. Earl said that if his father had been around when he was growing up, Earl would not have gotten involved in drug dealing.

**{¶ 201}** By the time Spaulding was an adult, Earl frequently visited Akron to see his half-siblings. Earl recalled spending time with Spaulding and Singleton and seeing them argue, but he never witnessed physical violence between them. He had heard about Spaulding's convictions for domestic violence against Singleton and also rumors that Singleton used drugs.

**{¶ 202}** Earl described Spaulding as a "good guy" who loves his kids and is not a "monster."

### 3. *Kamilah Spaulding*

**{¶ 203}** Spaulding's younger sister, Kamilah, described him as sensitive, kind, and caring. She testified that they grew up in a nice area and that their parents tried to isolate them from certain parts of the city. Their mother was strict and wanted to ensure that her children would be successful.

**{¶ 204}** Ronnie Spaulding stayed with their family several times when they were growing up, most recently around 2000. He was a hard worker, but he was

probably involved in illegal drug activity. Kamilah said that Ronnie and Spaulding were close and that Ronnie influenced him. Spaulding sold drugs to earn money; he had not held a regular job for four or five years before the murders.

{¶ 205} Kamilah testified that Spaulding and Singleton argued frequently but that she never saw any physical violence. On cross-examination, Kamilah said that Singleton had benefited from Spaulding's drug activity. She explained that although Singleton lived in government-subsidized housing, she and their children "had everything they needed plus some."

{¶ 206} Kamilah testified that Spaulding loves his children very much. According to Kamilah, Spaulding regularly told the kids how much he loves them and took them shopping, to the movie theater, and to the park.

{¶ 207} Kamilah also said that Spaulding was "really close" to their parents. When their father died, Spaulding acted as though he had lost his best friend. He became angry and began to "stay[ ] away" from the family.

{¶ 208} Kamilah also described the 2001 domestic-violence incident involving Spaulding and their mother. She said that Spaulding was disrespectful to their mother and smacked Kamilah. And on cross-examination, Kamilah testified that Spaulding has no history of mental-health treatment, that he has never been shot at, and that his family has always supported him through his criminal problems.

{¶ 209} Kamilah asked the jury not to sentence Spaulding to death. She suggested that life in prison would be sufficient punishment and would give Spaulding the opportunity to continue teaching his children and to mentor other prisoners.

*4. William Spaulding Jr.*

{¶ 210} William Spaulding Jr., Spaulding's half-brother, grew up in Detroit and Akron. He testified that he had a good childhood, a good family, and a good community. But his mother and her relatives were "drinkers," and he regularly had to defend his mother from abusive boyfriends. In addition, William Jr. was exposed

to violence and gang activity. He sometimes got into fights, but he denied any involvement with drugs.

{¶ 211} In 1995, William Jr. moved back to Akron. He tried to steer Spaulding, who was then 10 or 11 years old, in the right direction. He wanted Spaulding to go to school and avoid prison. But he said that Ronnie—who was "into the streets a little bit"—probably did not lead Spaulding in the right direction.

{¶ 212} At the time of Spaulding's trial, William Jr. had convictions for receiving stolen property and aggravated robbery, had been in and out of prison, and was 17 years into a prison sentence. He explained that prison life is hard because prisoners do not see their family and friends, they have to deal with corrections officers, and they encounter prison gangs and homosexuals. According to William Jr., prisoners have a lot of time to think about their mistakes. But they can improve themselves by taking classes and mentoring other prisoners.

{¶ 213} William Jr. testified that Spaulding deserves a chance. He said that Spaulding had expressed remorse in letters, saying that he was sorry for the situation, his family, and the families of the victims.

*5. Unsworn statement*

{¶ 214} According to his unsworn statement, Spaulding prays for all three families and apologizes for their losses, especially the Singletons'.

{¶ 215} Spaulding's statement also reflected on his own family. He stated that he thinks daily about the time he, Erica, Dre'San, and Damonie spent as a family and explained how close he is to his children. He taught his children right from wrong, and he wants to be sure that his son and his nephews do not "go to the street life" like he did. He wants to be there for them and have a positive impact on them.

{¶ 216} Spaulding also stated that he respects and accepts the jury's verdict, but he added, "[P]lease don't kill me." He wants an opportunity to prove that if sentenced to life in prison, he can still help his children and see them graduate from

high school.  He is worried about his children not having a mother or father and about his sister, Kamilah, losing her closest relative if he is sentenced to death.

### 6. Rebuttal witness

{¶ 217} The state presented one rebuttal witness, Deputy Black of the Summit County Sheriff's Office.  Black testified about Spaulding's behavior in jail while he was awaiting trial.

{¶ 218} According to Deputy Black, Spaulding received ten disciplinary write-ups for incidents like disobeying staff, not being awake in the morning, showing blatant disrespect, and possessing an unauthorized instrument.  Two entries advised using caution with Spaulding:  (1) a deputy said that she heard Spaulding mumble that "he would get even" as she was escorting him back from court, and (2) a deputy said that he or she "overheard an inmate state what sounded like 'I'm a killa cop' " from outside a room.  Upon entering, the deputy saw Spaulding talking on the inmate phone and only one other prisoner in the room.

{¶ 219} Deputy Black said that these are low-level, middle-of-the-road write-ups.  In his experience, Spaulding is respectful and polite.

### b. Weight of mitigating factors

{¶ 220} At the mitigation phase, Spaulding's counsel asked the jury to consider his history, character, and background, *see* R.C. 2929.04(B), and other relevant factors under R.C. 2929.04(B)(7).  Spaulding does not now assert, nor does the record indicate, that any other statutory mitigating factors apply.

{¶ 221} As an initial matter, we find nothing mitigating in the nature and circumstances of Spaulding's offenses.  *See* R.C. 2929.04(B).  Armed with a gun, Spaulding went to the home of Ernie Thomas on the morning of December 15.  Thomas was dating Erica Singleton, the mother of Spaulding's two young children.  At approximately 2:00 a.m., Spaulding shot Patrick Griffin as Griffin exited Thomas's house, inflicting injuries that rendered Griffin a quadriplegic.  About six

hours later, Spaulding returned to the house and fatally shot both Thomas and Singleton.

**{¶ 222}** Spaulding presented significant evidence of his difficult childhood and family background, although aspects of his upbringing appear quite positive and stable. His father had 11 children (by five different women), many of whom were raised in Detroit in their father's absence and exposed to regular violence. But Spaulding and his sister, Kamilah, were raised in Akron by their father, a hard worker, and their mother, a strict disciplinarian who sought to give them every opportunity. At times, money was tight, especially after Spaulding's father was diagnosed with cancer.

**{¶ 223}** Spaulding and his father were very close; indeed, his father devoted more attention to Spaulding, his youngest son, than he had to his older sons. Spaulding was devastated when his father died in 2010. There is some suggestion that at that point, Spaulding's attitude toward crime and drugs changed.

**{¶ 224}** Spaulding was exposed to crime by at least three of his older half-brothers. Ronnie Spaulding introduced Spaulding to drugs, and they eventually sold drugs together. Earl Spaulding also sold drugs. And William Jr. has been incarcerated several times. We give limited weight to Spaulding's family history and background. *See State v. Jackson*, 141 Ohio St.3d 171, 2014-Ohio-3707, 23 N.E.3d 1023, ¶ 297 (exposure to drugs and violence as a young person not entitled to significant weight).

**{¶ 225}** Second, Spaulding presented evidence of his positive contributions as a father and uncle. He loves his children and has tried to teach them the difference between right and wrong. In his unsworn statement, Spaulding stated that he has attempted to steer his son and his nephews away from his own criminal path. We assign some weight to this evidence of character. *See State v. Mitts*, 81 Ohio St.3d 223, 236, 690 N.E.2d 522 (1998).

**{¶ 226}** Third, Spaulding expressed remorse. In his unsworn statement, he stated that he prays for the families of all three victims, especially the Singletons. He apologized for their losses. And William Jr. testified that Spaulding had expressed remorse to him in letters. Despite Spaulding's expressions of remorse, he did not take responsibility for his conduct. We therefore assign minimal weight to Spaulding's remorse. *See Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.2d 818, at ¶ 160 (assigning some mitigating weight to the defendant's remorse where there was "no question that Kirkland expressed a good deal of self-loathing in his unsworn statement").

**{¶ 227}** Fourth, Spaulding argues that he can adjust well to life in prison. He committed ten relatively minor infractions during the year he was awaiting trial. Spaulding also emphasizes that if sentenced to a term of life imprisonment, he could continue to be a father to his children and a brother to Kamilah, and also could mentor other inmates. William Jr. identified many opportunities for self-improvement in prison. And Spaulding's counsel argued during the mitigation phase that Spaulding "needs and deserves an opportunity to show that he can make amends for the wrong he's done." We afford this evidence minimal weight. *See State v. Smith*, 80 Ohio St.3d 89, 121, 684 N.E.2d 668 (1997) (adjustment to incarceration afforded marginal weight). *Compare State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 281 (according "some weight in mitigation" when the defendant's prison conduct had been "exemplary").

### 3. Weighing

**{¶ 228}** As detailed above, Spaulding has presented mitigating evidence that is cumulatively entitled to some weight. However, the aggravating circumstance in this case—Spaulding's murder of two individuals and attempted murder of a third during a single course of conduct—outweighs the mitigating factors beyond a reasonable doubt.

### *4. Proportionality*

{¶ 229} The death penalty is appropriate and proportionate in this case when compared to death sentences affirmed in similar cases. *See, e.g.*, *State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80 (one murder and six attempted murders); *Jackson*, 141 Ohio St.3d 171, 2014-Ohio-3707, 23 N.E.3d 1023 (one murder and two attempted murders).

## III. CONCLUSION

{¶ 230} We reject each of Spaulding's propositions and affirm his convictions and sentence of death.

Judgment affirmed.

O'CONNOR, C.J., and PFEIFER, O'DONNELL, LANZINGER, and KENNEDY, JJ., concur.

O'NEILL, J., dissents, with an opinion.

_____

**O'NEILL, J., dissenting.**

{¶ 231} Respectfully, I dissent.

{¶ 232} When society sets out to take the life of a citizen, good enough is not good enough. This is especially true when the state seeks to try a defendant for all the sins of a lifetime at once. I would vacate the guilty verdicts in this matter for the reasons specific to this case that are explained below, and I would therefore not reach the constitutional questions regarding capital punishment, about which I have written many times before, *e.g.*, *State v. Wogenstahl*, 134 Ohio St.3d 1437, 2013-Ohio-164, 981 N.E.2d 900, ¶ 1-5 (O'Neill, J., dissenting).

*Prior Bad Acts and Magistrate Testimony*

{¶ 233} There simply is no justification for undermining the focus of a murder trial by combining it with the prosecution of other crimes and creating a very confusing amalgamation of multiple trials in which evidence of multiple crimes committed over several years was presented. In this matter, a jury was asked

to take the life of a fellow citizen. Its focus must be laser clear, and the court's protection of the process must be the equivalent of "super due process."

{¶ 234} Along with two counts of aggravated murder and one count of attempted murder, the state charged appellant, Dawud Spaulding, with third-degree-felony domestic violence, R.C. 2919.25(D)(4), and menacing by stalking, R.C. 2903.211(A)(1). By definition, the prosecution of these crimes required the presentation of evidence that the defendant not only killed someone but had been a very bad and violent person for a long time as well. The prejudice is evident on its face.

{¶ 235} The domestic-violence charge required proof of prior domestic-violence convictions. R.C. 2919.25(D)(4). The menacing charge required proof of a pattern of conduct causing the victim to fear that Spaulding would cause her physical harm or mental distress. R.C. 2903.211(A)(1). By charging these crimes together with the murder charges, the state set the tone of the trial. In the sentencing phase of this capital case, there was the very real possibility that the jury would be faced with weighing Spaulding's history, character, and background, R.C. 2929.04(B), against the aggravating circumstance that he engaged in "a course of conduct involving the purposeful killing of or attempt to kill two or more persons," R.C. 2929.04(A)(5). At sentencing, those are relevant issues. But long before embarking on the task of weighing factors in sentencing, this jury heard very damaging testimony, during the guilt phase, from two magistrates suggesting that in the past, Spaulding had been violent toward Erica Singleton, one of the murder victims, and on one occasion had threatened her with a gun. Incredibly, the jury would also hear testimony and see a journal entry showing that Spaulding had committed domestic violence against his own mother and sister in 2001. How is one supposed to have a fair trial on the questions of guilt when the whole tenor of the testimony being presented has the undeniable effect of causing the jurors to view the accused in a very negative light?

**{¶ 236}** Tragically, defense counsel remained passive in their chairs while this legally impermissible evidence was introduced. In his sixth proposition of law, Spaulding identifies several instances of testimony as inadmissible character evidence and claims that his counsel were ineffective for failing to object. The majority is willing to recognize that evidence of the facts of the 2001 conviction for domestic violence against Spaulding's mother and sister *did not have any probative value* as to any fact in issue that outweighed the risk of a prejudicial character inference and that the evidence should have been excluded. *See* majority opinion at ¶ 128. But the court then decides that this is not enough to rise to the level of plain error and that "Spaulding cannot establish that 'but for' the admission of evidence about the 2001 domestic-violence incident, 'the result of the proceeding would have been different.' " *Id.* at ¶ 130, quoting *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In my view, the majority stretches the imagination to the breaking point when it concludes that evidence of domestic violence against this defendant's mother and sister had *no influence* on the jury's decision to convict him of a violent act against the mother of his children.

**{¶ 237}** In his seventh proposition of law, Spaulding claims that it was structural error to admit testimony from the two magistrates describing Singleton's testimony during the ex parte domestic-relations hearings held in August and December 2011. Spaulding argues that the jury may have assigned greater weight to the magistrates' testimony than to that of other witnesses and that trial counsel were ineffective for failing to object. The majority declines that invitation and reviews the record for plain error. *Id.* at ¶ 137. The majority then holds that Spaulding has not shown plain error because none of the magistrate testimony was "outcome determinative" and "even assuming that trial counsel should have objected * * *, the error was not outcome determinative." *Id.* at ¶ 141.

**{¶ 238}** I believe that that is the wrong legal standard. This court rejected "outcome determinative" as the test for plain error a long time ago. The correct

standard is that when a criminal defendant raises an error for the first time on appeal, that person must "demonstrate a reasonable *probability* that the error resulted in prejudice—the same deferential standard for reviewing ineffective assistance of counsel claims." (Emphasis sic.) *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22. The United States Supreme Court has also rejected an outcome-determinative test for analyzing plain error and ineffective assistance. *Strickland* at 697 ("With regard to the prejudice inquiry, only the strict outcome-determinative test, among the standards articulated in the lower courts, imposes a heavier burden on defendants than the tests laid down today"); *United States v. Dominguez Benitez*, 542 U.S. 74, 83, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004), fn. 9 ("The reasonable-probability standard is not the same as, and should not be confused with, a requirement that a defendant prove by a preponderance of the evidence that but for error things would have been different"). Put simply, "a reasonable probability that * * * the result of the proceeding would have been different," *Strickland* at 694, is a little more *could have* than *would have*. And that is why the Supreme Court clarified that a "reasonable probability" is "a probability sufficient to undermine confidence in the outcome," *id.*, instead of a probability sufficient to show that the outcome was wrong.

{¶ 239} I have grave concerns that the jury reached its verdicts in this case for the wrong reasons. Domestic violence against one's mother is a special kind of cruelty. There is a real risk that the jury reached its verdict based on a character inference from the facts of Spaulding's crime against his mother. For that reason, counsel should have objected at least to the testimony regarding Spaulding's domestic violence toward his mother and sister, and we should vacate the convictions and remand the matter for a new trial. This is classically a bell that cannot be unrung.

{¶ 240} Moreover, magistrates and judges possess practically irrefutable credibility of the kind that might dissuade jurors from thinking critically about their

credibility. There is a reasonable probability that the jury decided to convict Spaulding based on the inference that he must have done the crimes charged because the magistrates believed that he was dangerous enough to have issued ex parte civil protection orders against him in the past. It is pure speculation to conclude during appellate review that if the trial court had excluded the testimony of the magistrates and all the prior bad acts, the outcome of the trial would have been the same. But that is not the question before us. This is inadmissible character evidence introduced into a capital murder case, and the refuge of concluding that "it didn't change the outcome" is simply not available here.

**Old Chief—*Proof of Prior Convictions***

**{¶ 241}** The state offered journal entries memorializing five prior convictions of Spaulding, two for trafficking drugs and three for domestic violence. The prior convictions were relevant to the domestic-violence charge and to the charge of having a weapon while under disability, which required proof that Spaulding had been "convicted of any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse." R.C. 2923.13(A)(3). Spaulding claims in his ninth proposition of law that the trial court should not have admitted the journal entries, based on *Old Chief v. United States*, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997), and claims in his tenth proposition of law that trial counsel were ineffective for failing to object to the entries or seek a stipulation to their content. He is right.

**{¶ 242}** The majority refuses to address whether *Old Chief* applies to state-law prosecutions in Ohio because defense counsel did not seek a stipulation under *Old Chief*. *See* majority opinion at ¶ 152. And the majority further denies that the failure to seek an *Old Chief* stipulation was ineffective assistance because the jury "still would have learned that he had at least prior felony drug convictions and prior domestic-violence convictions" and had already heard testimony regarding the

incidents underlying the prior domestic-violence convictions. Majority opinion at ¶ 153. This logic is mistaken.

{¶ 243} I generally agree with the majority's description of the import of *Old Chief*. In *Old Chief*, the United States Supreme Court set out important guidelines for balancing under Fed.R.Evid. 403 the probative value of evidence and the risk of unfair prejudice that the evidence presents. *See Old Chief* at 180-185. Ohio has an almost identical rule regarding the exclusion of otherwise probative evidence due to the risk of unfair prejudice. *Compare* Evid.R. 403(A) ("Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice * * *") *with* Fed.R.Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of * * * unfair prejudice * * *"). We have noted that "federal law interpreting a federal rule, while not controlling, is persuasive authority in interpreting a similar Ohio rule." *Stammco, L.L.C., v. United Tel. Co. of Ohio*, 136 Ohio St.3d 231, 2013-Ohio-3019, 994 N.E.2d 408, ¶ 18.

{¶ 244} *Old Chief* stands for two important propositions. First, "the Rule 403 'probative value' of an item of evidence, as distinct from its Rule 401 'relevance,' may be calculated by comparing evidentiary alternatives." *Old Chief*, 519 U.S. at 184, 117 S.Ct. 644, 136 L.Ed.2d 574; *see also* Fed.R.Evid. 401 (defining "relevant" evidence). Second, when "there is no cognizable difference between the evidentiary significance of an admission and of the legitimately probative component of the official record the prosecution would prefer to place in evidence," then the "functions of the competing evidence are distinguishable only by the risk inherent in the one and wholly absent from the other." *Id.* at 191. These are exceedingly wise observations about Fed.R.Evid. 403, and there is no good reason not to heed them when applying Ohio's Evid.R. 403(A).

{¶ 245} The five journal entries memorializing Spaulding's prior convictions provide more information than merely the existence of the prior

convictions and the offenses of which he was convicted. Each journal entry recording a conviction for drug trafficking also indicates the length of Spaulding's sentence and the specific drugs he sold. Each journal entry recording a conviction for domestic violence shows again the length of Spaulding's prison sentence (if any) as well as an order to have no contact with the victim or victims.

{¶ 246} Taken together, these journal entries show a progression over time from lighter punishments like fines and community control to terms of imprisonment. The journal entries also show that Spaulding progressed from crimes against his own sister and mother to crimes against Singleton—for which he was prohibited from having unsupervised contact with his own children. This is precisely the kind of content in a record of a conviction that "would be arresting enough to lure a juror into a sequence of bad character reasoning." *Old Chief* at 185. The jury was told how long Spaulding went to prison, his relationship to his victims, the specific kinds of drugs he was selling, and the precautions a prior court had taken to protect his children from *him*.

{¶ 247} I believe that defense counsel were ineffective for failing to object to the entries or seek a stipulation to their content. There is enough "risk inherent" in the surplusage of these journal entries, *Old Chief* at 191, to have created a reasonable probability that if counsel had stipulated to their content, the trial court would have been bound under Evid.R. 403(A) to accept the stipulation. They did not. Again, I reject the majority's familiar retort that Spaulding cannot prove prejudice under *Strickland* because the jury heard other testimony relaying the facts of some of these convictions. Are we now going to ratify the admission of prejudicial evidence with the observation that it does not stand alone? To the extent that the testimony of the prior incidents of domestic violence was alternatively admissible to prove the "pattern of conduct" element in the menacing-by-stalking charge, R.C. 2903.211(A)(1), I believe, as I explain below, that Spaulding should have been tried separately for that charge.

*Severance*

**{¶ 248}** If Spaulding committed all the charged crimes, then he should face justice for all of them. But his trial stands out as patently unfair because he had to face justice for all his crimes at the same time. None of the unfairness that I have already discussed would have been an issue had the trial court severed the charges for separate trials. Even the majority can recognize that "if Spaulding had requested severance of [the domestic-violence and menacing-by-stalking charges] and provided the trial court adequate information about the prejudicial effect that joinder would have on his trial, the court would have been justified in severing these counts for trial." Majority opinion at ¶ 73. This is not a question of whether or not this individual had the best, or worst, lawyers imaginable. At this level, the inquiry is into whether the people of Ohio have received a fair trial in which they can have confidence sufficient to take the life of a fellow citizen.

**{¶ 249}** Instead of moving to sever the domestic-violence, menacing, and gun charges from the murder charges, however, Spaulding asked the court to sever the attempted-murder charge from the aggravated-murder charges. That motion served no useful purpose. This was an obvious mistake by defense counsel, because the murder charges were all connected by common evidence and the other charges required different proof, presenting an obvious risk of unfair prejudice.

**{¶ 250}** Even under the plain-error standard, which I can agree is the correct standard of review, I would vacate Spaulding's convictions on this proposition. There is "a reasonable probability that the error resulted in prejudice" for two reasons. (Emphasis deleted.) *Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, at ¶ 22. First, if the majority can recognize that the trial court would have been justified in severing the domestic-violence and menacing charges from the murder charges, then there is a reasonable probability that the trial court would have done so if asked. And second, I have no doubt that the unusual volume of character and prior-bad-acts evidence admitted in this case had some impact on the

64

jury's aggravated-murder verdicts and death sentence. That further undermines my confidence in the verdicts and supports reversal even if I cannot say that "but for error things would have been different," *Dominguez Benitez*, 542 U.S. at 83, 124 S.Ct. 2333, 159 L.Ed.2d 157, fn. 9.

{¶ 251} Spaulding argues in his fifth proposition of law that the trial court violated his rights to due process and a fair trial when it denied his motion for relief from prejudicial joinder. I agree. Finding it to be plain error that the trial judge did not sever the attempted- and aggravated-murder charges from the remaining charges, I would vacate Spaulding's convictions and sentence and remand the matter for separate trials.

{¶ 252} The claims asserted in this appeal do not fit perfectly into the plain-error standard or the ineffective-assistance-of-counsel test articulated by the majority. But I believe that they fit squarely within the plain-error and ineffective-assistance standards that we are bound to follow by our own precedents and those of the United States Supreme Court. And furthermore, I believe that a more critical look at the gray areas in this case shows that Spaulding did not receive the "fair trial and substantial justice" owed to him under Sections 10 and 16 of Article I of the Ohio Constitution, *State v. Hester*, 45 Ohio St.2d 71, 79, 341 N.E.2d 304 (1976).

{¶ 253} For all these reasons, I dissent.

_____

Sherri Bevan Walsh, Summit County Prosecuting Attorney, and Heaven DiMartino, Assistant Prosecuting Attorney, for appellee.

Donald Hicks; and The Law Office of Donald Gallick, L.L.C., and Donald Gallick, for appellant.

_____